UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DISABLED IN ACTION, a nonprofit organization, BROOKLYN CENTER FOR INDEPENDENCE OF THE DISABLED, a nonprofit organization, PAULA WOLFF, an individual, JEAN RYAN, an individual, EDITH PRENTISS, an individual, and DUSTIN JONES, an individual, on behalf of themselves and all others similarly situated, | No. 1:16-cv-8354 |
| <div align="center">Plaintiffs,</div> | **COMPLAINT** |
| -against- | |
| THE CITY OF NEW YORK, NEW YORK CITY POLICE DEPARTMENT, and JAMES O'NEILL, in his official capacity as Commissioner of the New York City Police Department, | |
| <div align="center">Defendants.</div> | |

## INTRODUCTION

1.    This class-action lawsuit seeks to end decades of civil rights violations committed by the City of New York ("the City") against persons with mobility disabilities who seek access to the programs, services, and activities of the New York City Police Department ("NYPD") at police stations throughout the City.

2.    Seeking police protection—one of the most critical government services—should be available to all citizens on an equal basis.  Yet over 26 years after the enactment of the Americans with Disabilities Act, 44 years of the passage of the Rehabilitation Act, and more than 35 years after amendment of the New York City Human Rights Law to cover disability discrimination, Defendants continue to exclude disabled New Yorkers from programs, services, and activities critical to public safety.

3.      The NYPD operates seventy-seven (77) police stations throughout the five boroughs of New York City.

4.      The majority of the 77 police stations in NYC contain one or more architectural barriers to people who use wheelchairs, walkers and other mobility devices.

5.      New Yorkers rely upon police stations for essential public services, including basic safety and protection.

6.      Police stations allow individuals to report crimes, ask for protection, and provide areas of refuge for people who feel unsafe.

7.      Police stations are not merely centers for issues concerning response to criminal activity, but also act as a hub for a wide range of community affairs, meetings and services, such as community council meetings, drop-off programs for expired medications, crime prevention programs, neighborhood watch meetings, and information about events and activities in the neighborhood.

8.      Individuals can go to their local police station to obtain permits for events and to inquire about community concerns.

9.      Some stations hold community parties and food drives, as well as perform outreach to groups that are not typically engaged with the NYPD, such as new immigrant communities and the LGBT community.

10.     Police stations throughout New York City contain numerous barriers for those with mobility disabilities, including obstructed paths of travel to station entrances, steps at the entrances of police stations, stairs inside stations, unreasonable or unsafe alternate accessible routes or an absence of signage for alternative routes, and bathrooms that are inaccessible for wheelchair users.

11.     Over one-half of police stations in New York City have architectural barriers affecting people with disabilities.

12.     Police stations in at least 32 precincts, representing over forty-one percent (41%) of all New York City police stations, do not even have a wheelchair-accessible primary entrance.

13.     Because of these barriers, people who must use wheelchairs, walkers and other mobility devices are denied access not only to the police stations themselves, but to protection in the event of a crisis or emergency and to the programs, services, and activities offered at these police stations throughout the City.

14.     Instead of entering a police station independently, as people without mobility disabilities freely do, people with disabilities are often barred at the front door.  If there is an entrance that can only be used with assistance, people who attempt to visit the station must locate an officer and then alert them to their presence, then wait outside to either be escorted indoors or otherwise helped in.  This not only inconveniences and embarrasses them, but also can directly threaten their safety.

15.     Many New Yorkers with disabilities, such as Plaintiffs Jean Ryan and Paula Wolff, have been forced to wait long periods of time on sidewalks in front of police stations, sometimes in inclement weather, to obtain safety-related services that people without disabilities can access immediately by walking into the station.

16.     Defendants have created harm to New Yorkers with disabilities by maintaining many inaccessible police stations, then compounded that harm by making it extremely difficult to determine which stations are accessible to or usable by people who use wheelchairs, scooters or walkers and which are not.  Such information is not available on their website, resulting in people who use wheelchairs not knowing in advance when they go to a station whether they can

enter and use it or not.  When the front entrance is not accessible, but an alternate entrance is, signs directing people with disabilities to the alternate entrance are often either missing or improperly located so that individuals do not know if they can get into the police station.

17.     Defendants are aware of the systemic inaccessibility of their police stations and the programs, services, and activities offered there, but have not acted to remedy the architectural barriers that discriminate against people with disabilities.

18.     Defendants' failure to provide lawful access to police stations and the programs, services, and activities offered there violates Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the New York City Human Rights Law.

## JURISDICTION

19.      This is an action for declaratory and injunctive relief, brought pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.* ("Section 504"), and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq*.

20.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343 for claims arising under the ADA and Section 504.

21.     This Court has supplemental jurisdiction over the NYCHRL claim pursuant to 28 U.S.C. § 1367.

22.     This Court has jurisdiction to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## VENUE

23.     Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b), because Defendants are located within this District and a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## PARTIES

24.     Plaintiff Disabled In Action of Metropolitan New York ("DIA"), founded in 1970, is a nonprofit civil rights membership organization committed to ending discrimination against people with all disabilities.  DIA consists primarily of and is directed by people with disabilities who live and work in New York City.  DIA meets once a month at 135 West 23rd Street in Manhattan.

25.     Plaintiff Brooklyn Center for Independence of the Disabled ("BCID") is a nonprofit grassroots organization founded in 1956 that provides services and advocacy for Brooklyn residents with disabilities.  BCID is an independent living center operated by a majority of people with disabilities, with members and constituents throughout Brooklyn.

26.     Plaintiff Paula Wolff uses a wheelchair for mobility and is a member of Disabled In Action.  She resides in the Chelsea neighborhood of Manhattan, which is served by the 13th Precinct.  She has encountered barriers while attempting to access police stations in the 10th and 13th Precincts in Manhattan.  She is a qualified person with a disability within the meaning of all applicable statutes.

27.     Plaintiff Jean Ryan uses a wheelchair for mobility and is a member of Disabled In Action.  She resides in the Bay Ridge neighborhood of Brooklyn, which is served by the 68th Precinct.  She has encountered barriers while attempting to access the police station in the 68th Precinct.  She is a qualified person with a disability under all applicable statutes.

28.     Plaintiff Edith Prentiss uses a wheelchair for mobility and is a member of Disabled In Action.  She resides in the Washington Heights neighborhood of Manhattan, which is served by the 34th Precinct.  She has encountered barriers while attempting to access the police station in the Midtown South Precinct in Manhattan.  She is a qualified person with a disability under all applicable statutes.

5

29.     Plaintiff Dustin Jones uses a wheelchair for mobility and is a member of Disabled In Action.  He resides in the Belmont neighborhood of the Bronx, which is served by the 48th Precinct.  He has encountered barriers at police stations in the 46th and 48th Precincts in the Bronx and at the police station in the 103rd Precinct in Queens.  He is a qualified person with a disability within the meaning of all applicable statutes.

30.     Defendants New York City and the NYPD, as defined by the laws of the City of New York, are government entities.  As such, Defendants qualify as "public entities" within the meaning of Title II of the ADA, as that term is defined under 42 U.S.C. § 12131(l) and 28 C.F.R. § 35.104.

31.     Defendants New York City and the NYPD are recipients of federal financial assistance within the meaning of Section 504 of the Rehabilitation Act.

32.     Defendants New York City and the NYPD are the public entities responsible for constructing, repairing, and maintaining police stations in New York City.

33.     Defendant James O'Neill, sued in his official capacity, is Police Commissioner of the NYPD and thus responsible for and a participant in the actions and omissions of the NYPD.

## FACTUAL ALLEGATIONS

**A.      New York City Police Stations Are Hubs for Community Activities and Public Safety.**

34.     Defendants own, maintain, or operate approximately 77 police stations throughout the five boroughs of New York City.

35.     These stations offer programs, services, and activities that are central to community safety within the City.

36.     Police stations serve as places of refuge for individuals attempting to flee dangerous situations at home or while traveling throughout New York City.  Individuals can also go to police stations to report crimes and obtain police reports in a safe, private environment.

37.     Because New Yorkers can encounter crimes or other dangerous situations at any time while traveling, it is often impossible to predict which particular police station an individual may seek to access.

38.     In addition to promoting public safety, police stations foster community engagement among residents of each precinct.

39.     Each precinct has a Community Council that meets at the police station building once a month.

40.     At the meetings, community members have the opportunity to meet with officers to discuss public safety and other problems in their neighborhood and work toward solutions.

41.     Precincts also organize trainings for community members who volunteer to act as the eyes and ears of the NYPD, including the Citizens' Police Academy, the Youth Police Academy, and the Civilian Observation Patrol.

42.     The precincts also administer crime prevention programs, such as vehicle and bicycle registration, gun buy-back programs, and crime prevention lectures with information about home security.

43.     Each police station offers outreach, information and programs unique to and of special advantage to the people in that precinct.  Police officers and other personnel at each station have a specialized and unique knowledge of and experience with the neighborhoods, populations, customs, networks and customs within that precinct.

B.    **New York City Police Stations are Rife with Architectural Barriers that Prevent People with Mobility Disabilities from Receiving the Benefits of Programs, Services, and Activities.**

44.    Police stations throughout New York City contain numerous architectural barriers to access for persons with mobility disabilities.  For example, to enter station buildings, individuals must navigate paths of travel that are often inaccessible to people with mobility disabilities due to barriers such as police cars unnecessarily, and perhaps illegally, parked in paths of travel.

45.    Upon reaching the police station, individuals often must climb one or more stairs to access the entrance.  Even if alternate accessible entrances are available, individuals encounter obstacles such as missing or improperly located signs to the alternate entrances, locked gates and doors, unsafe accessible routes through actively-used driveways, and debris-strewn paths of travel.

46.    Inside the police stations, individuals often encounter additional steps or lifts that are broken or have missing keys necessary for operation.  Other barriers inside police stations include inaccessible waiting areas, service and information desks, interview rooms, and restrooms.

47.    People who must use wheelchairs or other assistive devices often cannot choose the precinct that they will go to.  Any individual in need of refuge from an unsafe situation will seek out the closest police station to where they are, regardless of whether it is the station corresponding to the precinct where they live or work.  A person with a disability seeking safety at a police station needs to have the same opportunity to enter and use that station as someone without a disability.

48.    When crimes are committed against persons with disabilities, they report the crime in the precinct where it was committed.  Often, they must return to that precinct's police

8

station for follow-up matters, such as additional questioning, witness identification, or obtaining a copy of a police report.

49.     Because so many of the police stations in New York City are inaccessible to people who use wheelchairs, scooters, walkers and other mobility devices, it is common to have multiple contiguous precincts with inaccessible police stations in any one borough, thus further impeding a person with a disability's access to a police station within any reasonable distance from their residence.

50.     Defendants exclude persons with mobility disabilities from essential public safety programs, services, and activities of providing areas of refuge for people who feel unsafe, allowing individuals to report crimes, drop off expired medications, participate in community councils, and other programs at police stations throughout the five boroughs of New York City.

51.     Providing and maintaining police stations is a critical public program, service, and activity that Defendants offer to residents of and visitors to New York City.  However, Defendants have failed to make New York City police stations safe for and usable by persons with mobility disabilities, thereby denying such individuals meaningful access to this critical public program, service, and activity, in violation of federal and New York City law.

**C.     Harm to Plaintiff Disabled In Action of Metropolitan New York**

52.     DIA has approximately 150 members who reside in New York City.  Many such members have mobility disabilities and use wheelchairs, walkers, or other devices to travel.

53.     DIA members have attempted to enter and use police stations throughout New York City to report crimes, pick up copies of police reports, attend community council meetings, and take advantage of other community safety programs.

54.     DIA members have encountered and continue to encounter architectural barriers at police stations throughout the City.

55.     One or more members of DIA, including Ms. Wolff, Ms. Ryan, Ms. Prentiss, and Mr. Jones, have been injured as a direct result of Defendants' discriminatory actions and failures to act and would have standing to sue in their own right.

56.     Additional DIA members have experienced incidents such as being forced to wait outside police stations to report crimes due to inaccessible entrances and inoperable lifts, attempting to flag down passers-by to help them get into police stations, and sacrificing their privacy to allow officers to come to their homes to conduct interviews that should have been performed at a police station.

57.     DIA can bring this action on behalf of itself and its members because the interests at stake are germane to DIA's mission of ending discrimination against people with disabilities.

58.     DIA's claims are limited to injunctive and declaratory relief.

59.     In addition, DIA itself has been injured as a direct result of Defendants' failure to ensure that police stations in New York City are accessible to people with disabilities.

60.     DIA's interests are adversely affected because it must expend resources advocating for its members who are harmed by Defendants' policies and practices that result in barriers to the accessibility of police stations.

61.     DIA currently expends substantial time and resources on advocacy work concerning policies and practices that affect access to public services for people with disabilities in New York City.

62.     For example, DIA organizes demonstrations and other assemblies to draw public attention to inaccessible public buildings, including government offices and polling places, that hinder the participation of people with disabilities in public life and thus frustrate DIA's mission.

63.     The persistent denial of access to the programs, services, and activities offered at New York City police stations hinders DIA's objectives of ending discrimination against persons with disabilities and promoting the ability of persons with disabilities to live independently in the community.  DIA must expend resources to remedy the frustration of its mission.

64.     Such injury would be directly redressed by a favorable decision in this case.

**D.     Harm to Plaintiff Wolff**

65.     Ms. Wolff has experienced and continues to experience barriers in attempting to access facilities at the 10th and 13th Precincts, and therefore, the programs, services, and activities at those facilities, because of Defendants' longstanding, ongoing, continuous violations of disability access laws.

66.     Ms. Wolff lives in Manhattan within the boundaries of the 13th Precinct.  The closest police station to Ms. Wolff's home is the 10th Precinct building located at 230 West 20th Street.

67.     According to 2014 census data, there are over 2100 persons with an ambulatory disability who live within the boundaries of zip code 10011, where the 10th Precinct police station is located, and approximately 1400 persons with an ambulatory disability live in zip code 10010, where the 13th Precinct police station is located.

68.     In November 2015, Ms. Wolff was hit by a car while crossing the street near the 10th Precinct building.  At the scene of the accident, Ms. Wolff spoke to police officers who took down information about the accident for a report.

69.     Thereafter, Ms. Wolff wanted to obtain a copy of the police report describing the accident.  However, to enter the 10th Precinct building, a visitor must climb two steps.  There are no alternate entrances that are accessible to a person with a mobility disability.  Because Ms.

Wolff uses a wheelchair and cannot climb stairs, she could not enter the 10th Precinct to pick up the police report.

70.     Because she could not enter the building, she was forced to send someone else inside to obtain the police report for her while she waited outside in the cold weather.  Having to wait outside took away Ms. Wolff's dignity, privacy, independence, and ability to speak for herself, in addition to causing her inconvenience and discomfort.

71.     There are also architectural access barriers inside the 10th Precinct building, including a non-ADA-compliant bathroom which has missing grab bars, pipes without insulation, and fixtures that are too high.

72.     Ms. Wolff wants to and intends to return to the 10th Precinct for any purpose appropriate for a citizen to use a police station, including in the event of any emergency that requires police protection.

73.     Because the entrance to the 10th Precinct is inaccessible, Ms. Wolff fears that she will be denied the programs, services, and activities offered at the station in the event of an emergency.

74.     The police station in Ms. Wolff's home precinct, the 13th Precinct, is also completely inaccessible to people with mobility disabilities because anyone seeking to enter must climb a flight of five stairs.  As a result, she cannot count on police protection in her home precinct, nor can she avail herself of community programs in the 13th Precinct.

75.     Access barriers inside the 13th Precinct include a non-ADA-compliant bathroom with has objects placed in required clear floor spaces under the bathroom sink and next to the toilet, uninsulated pipes, and wall-mounted fixtures that are too high.

76.     To reach the nearest police station without any stairs, Ms. Wolff would have to travel 13 blocks (1.1 miles) to the 6th Precinct at 233 West 10th Street.

**E.     Harm to Plaintiff Brooklyn Center for Independence of the Disabled**

77.     BCID's mission is to empower persons with disabilities by improving the quality of their lives and fostering their integration into the mainstream of society.

78.     BCID has constituents with all types of disabilities who live in Brooklyn. According to 2015 census data, over 170,000 persons with an ambulatory disability live in Brooklyn.  BCID directly serves approximately 1400-1700 people per year.

79.     BCID also has approximately 50 dues-paying members, including individuals with mobility disabilities who use wheelchairs, walkers, or other devices to travel.

80.     Members and constituents of BCID have attempted to access police stations throughout Brooklyn and New York City to report crimes, pick up copies of police reports, attend community council meetings, and take advantage of other community safety programs.

81.     BCID members and constituents have encountered and continue to encounter architectural barriers at police stations throughout Brooklyn and New York City.

82.     One or more constituents of BCID, including Ms. Ryan, have been injured as a direct result of Defendants' discriminatory actions and failures to act and would have standing to sue in their own right.

83.     Additional BCID members and constituents have experienced incidents such as being forced to wait outside police stations to report crimes due to inaccessible entrances and inoperable lifts, attempting to flag down passers-by to help them get into police stations, and sacrificing their privacy to allow officers to come to their homes to conduct interviews that should have been performed at a police station.

84.     BCID can bring this action on behalf of its members and constituents, and on behalf of itself, because the interests at stake are germane to BCID's mission of guaranteeing the civil rights of people with disabilities.

85.     BCID's claims are limited to injunctive and declaratory relief.

86.     In addition, BCID itself has been injured due to Defendants' failure to ensure that New York City police stations are accessible to people with disabilities.

87.     Barriers to police station access directly and adversely affect BCID's interests because BCID must expend resources to advocate for members and constituents who are harmed by the inaccessibility of local police stations.

88.     BCID expends significant time and resources on systems advocacy projects designed to dismantle physical, communication, and attitudinal barriers that prevent people with disabilities from participating fully in society.  For example, BCID advocates for full and equal access to public services such as emergency preparedness and access to transportation.

89.     The inaccessibility of New York City police stations frustrates BCID's mission of including people with disabilities in community life on an equal, independent basis.  BCID must expend resources to remedy the frustration of its mission.

90.     These injuries would be directly redressed by a favorable decision in this case.

**F.     Harm to Plaintiff Ryan**

91.     Ms. Ryan has experienced and continues to experience barriers in attempting to access, use, and benefit from the programs, services, and activities at the 68th Precinct because of Defendants' ongoing, continuous violations of disability access laws.

92.     Ms. Ryan's home neighborhood of Bay Ridge is within the 68th Precinct and served by a police station at 333 65th Street.

14

93.     According to 2014 census data, there are over 4600 persons with an ambulatory disability who live within the boundaries of zip code 11220, where the 68th Precinct police station is located.

94.     To enter the police station at 333 65th Street, a visitor must open an initial set of doors, climb four steps, then open a second set of doors.

95.     Ms. Ryan has complained to the head of the 68th Precinct Community Council, the Mayor's Office for People with Disabilities, and the NYPD Chief of Transportation about the illegal barriers and inaccessibility of the 68th Precinct building, but nothing has been done to remedy these barriers.

96.     In June 2015, the NYPD agreed to move Community Council meetings to a fully-accessible location.  However, the Community Council resumed meeting at the 68th Precinct building by March 2016, despite the continued presence of illegal barriers that prevent independent access for persons who use wheelchairs or have mobility disabilities.

97.     Because the Community Council meetings are not accessible to Ms. Ryan, she feels and is excluded from important aspects of her neighborhood and her community.

98.     In March 2014, a crime was committed at Ms. Ryan's property.  Afterwards, police officers repeatedly told her to go to the 68th Precinct to get information about her complaint and to obtain a copy of the complaint.

99.     Because she could not enter the police station, police officers came to her house to ask her to fill out the complaint.  Ms. Ryan felt humiliated by the presence of the officers in her home because she felt as though her neighbors were watching her and wondering what she had done to have police officers parked in front of her house.  She wanted to go to the police

station so that she could have privacy, but that was not an option because the station was barred by steps.

100.    In March 2016, Ms. Ryan returned to the 68th Precinct station so that she could drop off her expired medications as part of the precinct's pill drop-off program.

101.    When Ms. Ryan reached the entrance of the station, she immediately observed multiple stairs that blocked her from reaching the main entrance, as well as additional stairs leading from the entryway to the front desk.  The main entrance had not been made accessible by providing a ramp, a lift, or another means by which people with mobility disabilities could enter the station.

102.    To enter the 68th Precinct station, Ms. Ryan followed signage directing wheelchair users to travel using the auto and truck driveway to the right side of the entrance. She felt very unsafe using this route because a police car or other car or truck could have come up behind her at any time and hit her, a danger magnified after nightfall.

103.    Ms. Ryan turned left after reaching the end of the driveway and passed several full garbage bags that partially blocked the path of travel to the entrance before entering the station.  At the entrance, the doorway had a metal threshold that was elevated too high above the finish floor.

104.    Upon entering the 68th Precinct station through the alternate entrance, Ms. Ryan had to travel through the station to find someone who could help her because no officers were at the back entrance to provide service to people who cannot use the main entrance to the station.

105.    She also discovered that the 68th Precinct station has a front desk that is too high for a person in a wheelchair to see over.  In addition, Ms. Ryan could not operate the lock on the bathroom door because it was not ADA-compliant.

106.     After Ms. Ryan dropped off her expired medications at the bin, she spoke to two officers on duty about the danger that wheelchair users face when going down the driveway to enter the 68th Precinct station.  They informed her that, unlike everyone else, she needed to call the station in advance the next time she planned to come to the building so that she could be escorted by an officer when entering or exiting the building in order to keep her safe.

107.     That proposal forces Ms. Ryan to wait outside the building for an officer to come out, while individuals who do not use wheelchairs or walkers can enter right away.  She is concerned that she may have to wait outside the station until an officer has time to come get her and escort her up the driveway, which could endanger her if she sought to enter the station as a place of refuge.

108.     On Ms. Ryan's way out of the 68th Precinct station, a car was coming down the driveway behind her, and a second car turned quickly into the driveway in front of her.  Ms. Ryan felt trapped between the cars.

109.     Ms. Ryan feels unsafe because she cannot get into her local police station without either risking her safety as she travels down the driveway or waiting outside for an officer while losing precious time in an emergency.

110.     Ms. Ryan wants to and intends to return to the 68th Precinct station to attend Community Council meetings.  Further, Ms. Ryan intends to return in the event of an emergency that requires police protection.  She also intends to return if she needs to report a crime, obtain paperwork from a police report, or drop off expired medications.

111.     Because the entrances to the 68th Precinct station are either inaccessible or unsafe, Ms. Ryan is denied the services offered at the station in the event of an emergency that are available to others without disabilities.

17

112.     The 62nd and 66th Precincts, which are two of the three precincts contiguous to the 68th Precinct, also have inaccessible police stations barred by stairs.

113.     To reach the nearest police station without any stairs, Ms. Ryan would have to travel 36 blocks, or 2 miles, to the 72nd Precinct at 830 4th Avenue in Brooklyn.

**G.     Harm to Plaintiff Prentiss**

114.     Ms. Prentiss has experienced and continues to experience barriers in attempting to access programs, services, and activities at the Midtown South Precinct because of Defendants' ongoing, continuous violations of disability access laws.

115.     According to 2014 census data, there are over 900 persons with an ambulatory disability who live within the boundaries of zip code 10001, where the Midtown South Precinct police station is located.

116.     Ms. Prentiss lives in Manhattan within the boundaries of the 34th Precinct, which has a station located at 4295 Broadway.

117.     In October 2015, Ms. Prentiss was traveling south on 8th Avenue toward West 31st Street when she was hit by a metal plate hanging from a truck.  She attempted to enter the Midtown South Precinct station at 357 West 35th Street so that she could make a complaint.

118.     The police station in the Midtown South precinct has three steps in front of the entrance.  It also does not have any signs posted sufficiently nearby indicating where an accessible entrance is located or if an accessible entrance exists.  Instead of turning back at the steps, Ms. Prentiss decided to look for an entrance to the building she could use.

119.     She ultimately found a sign reading "Handicap Access" on a metal gate to the right of the building with the International Symbol of Access, which Ms. Prentiss had to guess led to an accessible entrance to the police station.  Ms. Prentiss struggled to open the gate because it was heavy and there was not an automatic opening mechanism.

120.    When Ms. Prentiss reached the back door of the station, she saw that it was open. Ms. Prentiss was concerned that if the door had not been propped open, she would have had to either wait for an officer to open the door for her or flag down somebody who could climb the stairs and let the police know that she was waiting outside to make a complaint.

121.    After entering from the back door, the route through the station led down a back hallway cluttered with debris, including a furniture cart, boxes, and a series of pipes.

122.    There were no signs or indications inside the station indicating that Ms. Prentiss was traveling along an accessible route available for wheelchair users to use to travel from the alternate entrance to the inside of the station.  She went through an unmarked door with no handle at the end of the hall, which led to the waiting room.

123.    The buildup of debris along the route from the door to the station, combined with the lack of guidance about where to go next, made Ms. Prentiss feel nervous, unsafe, and degraded and as though she had been relegated to second-class status in her attempt to use police services.

124.    Ms. Prentiss complained about the accessibility barriers of the station to an officer, who indicated that she could call the police if she had a complaint, and that officers would come to her.  Ms. Prentiss wants to have the same opportunity to access the police station that individuals without disabilities have.

125.    Ms. Prentiss travels through the area served by the Midtown South Precinct to go shopping, visit friends, and go to meetings about once a week.

126.    She wants and intends to return to the Midtown South Precinct in the event that she needs police protection or needs to file a complaint while in the area.

127.    Because the entrances to this police station are either inaccessible, unmarked, or unsafe, Ms. Prentiss fears that she will be denied the services offered at the station in the event of an emergency.

**H.    Harm to Plaintiff Jones**

128.    Mr. Jones, who must use a wheelchair for mobility, has experienced and continues to experience serious, degrading, and illegal barriers in attempting to access programs, services, and activities at the 46th, 48th, and 103rd Precincts because of Defendants' ongoing violations of disability access laws.

129.    Mr. Jones's home neighborhood of Belmont is within the 48th Precinct and served by a police station at 450 Cross Bronx Expressway.  The police station in the 46th Precinct, located at 2120 Ryer Avenue, is also close to Mr. Jones's home.

130.    Census data for zip code 10457, the area in which the 46th and 48th Precinct stations are located, shows that 14.5% of civilian non-institutionalized population have one or more disabilities and that 37.8% of the population age 65 and over have an ambulatory difficulty.

131.    The zip code which encompasses NYPD's 46th and 48th Precinct stations is of very low economic status.  40.6% of the population have incomes below the poverty level, 18.2% of households receive SSI, and 52.5% of the households receive food stamp/SNAP benefits.

132.    In April 2016, someone tried to break into Mr. Jones's apartment, so he went to the 48th Precinct to report the crime.

133.    Although the police station serving the 48th Precinct has a ramp at the entrance, the police station as a whole is not ADA-compliant.

134.    Mr. Jones struggled with the lack of turning space between the top of the ramp and the doors.  If the doors had not been propped open, he would have had difficulty in pulling the door to the station open without falling down the ramp.

135.    After entering the station, Mr. Jones made his way to a waiting area, where an officer sat at a security desk with a high counter that separated him from visitors to the police station.  Because the desk was so high, Mr. Jones could not see the officer.  He tried to keep his voice down so that other visitors to the station would not hear his complaint, but had to raise his voice to be heard over the barrier, and the officer loudly repeated his statements to ensure that he had heard them correctly.  The access barrier prevented Mr. Jones from keeping his complaint confidential and forced him to sacrifice his privacy.

136.    In May 2016, the police asked Mr. Jones to return to the 48th Precinct station for further questioning about the break-in.  During this visit, Mr. Jones was sent to the second floor of the police station to complete a police report.

137.    In the second floor waiting area, there was nowhere for Mr. Jones to park his wheelchair while waiting for the detectives to call him.  Mr. Jones tried to find an area where he was not blocking the paths of travel leading to the entrance and exit of the waiting area, but could not do so.  This made him feel unwelcome and embarrassed.

138.    Mr. Jones could not use the restroom on the second floor of the station because it was also not ADA-compliant and the stalls were too narrow to accommodate his wheelchair.

139.    On different occasions, Mr. Jones had reason to access police stations in the 46th and 103rd Precincts, but both stations were even less accessible to him than the 48th Precinct.

140.    Prior to moving to the Bronx, Mr. Jones lived in Hollis, Queens, within the 103rd Precinct.  He attempted to access the 103rd Precinct station twice in early 2015 to make a police report.

141.    To enter the 103rd Precinct police station and speak to officers, individuals must either climb stairs or wait for officers to find the key to a lift.  As a result, Mr. Jones could not enter the station independently.

142.    When Mr. Jones first attempted this in January 2015, he had to wait until two officers exited the building, then ask them for assistance to enter the station.  The officers told him that they did not know where the key to the lift was, so he could not come up.  As a result, he had to make the report while sitting in the parking lot of the station, which took away his independence and privacy, was uncomfortable, and could have potentially threatened his safety.

143.    Mr. Jones returned to the 103rd Precinct approximately two months later to make another report.  This time, an officer told him that the lift had broken the day before, so he could not come up.  However, Mr. Jones observed boxes and furniture stored on the lift, which cast doubt on whether the lift had been operable the day before.

144.    He had to report the incident in the vestibule of the police station.  The process made him feel as though the police did not value people with disabilities enough to provide or maintain equal access to the station.

145.    Mr. Jones also attempted to use the police station located in the 46th Precinct, but could not do so because the only entrance to the station had stairs.

146.    Mr. Jones wants and intends to return to the 48th Precinct in the event of an emergency that requires police protection,  although he expects he will continue to encounter

architectural barriers that make it difficult to access the police station and compromise his privacy and confidentiality.

## CLASS ALLEGATIONS

147.     Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, Plaintiffs bring this action, for injunctive and declaratory relief only, on their own behalf and on behalf of all persons similarly situated.  The class that Plaintiffs seek to represent consists of all persons with mobility disabilities who use and/or seek to use the programs, serves, and activities offered at New York City police stations.  The claims asserted herein are solely for injunctive and declaratory relief for the class; damage claims are not included in this complaint.

148.     The persons in the class are so numerous that joinder of all such persons is impracticable and the disposition of their claims in a class action is a benefit to the parties and to the Court.  Data from the United States Census American Community Survey conducted in 2014 indicate that more than 500,000 non-institutionalized New York City residents have a mobility disability.  In addition, hundreds of thousands of persons with mobility disabilities visit the City each year.

149.     According to the most recent United States census, there are over half a million people with ambulatory disabilities in New York City, constituting over 7% of the population. This is a higher percentage than in the United States (6.9%) and in New York State (6.7%).

150.     There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented in that they are all being denied, or will be denied, their civil rights and access to Defendants' police stations due to the barriers described herein.

151.     Common questions of law and fact predominate, including questions raised by Plaintiffs' allegations that Defendants have failed to provide meaningful access to New York

City police stations to persons with mobility disabilities in violation of Title II of the ADA,

Section 504 of the Rehabilitation Act, and the New York City Human Rights Law. Common

questions also include whether Defendants' system-wide policy failures have resulted in their

failure to provide accessible entrances to New York City police stations and their failure to

remove barriers to access inside police stations.

152. Plaintiffs are adequate class representatives because they, or their members, are

directly impacted by Defendants' failure to provide program access to New York City police

stations. The interests of Plaintiffs are not antagonistic to, or in conflict with, the interests of the

class as a whole. The attorneys representing the class are highly trained, duly qualified, and very

experienced in representing plaintiffs in civil rights class actions for injunctive relief.

153. Plaintiffs' claims are typical of the claims of the class as a whole because the

Plaintiffs are similarly affected by Defendants' failure to provide access to New York City police

stations. The architectural barriers that Plaintiffs have encountered are typical of the

architectural barriers throughout the system of police stations as a whole.

154. Defendants have acted and/or failed to act on grounds generally applicable to the

class as a whole, thereby making appropriate final declaratory and injunctive relief with respect

to the class as a whole.

**FIRST CAUSE OF ACTION**
**VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT**
**(42 U.S.C. § 12131, ET SEQ.)**

155. Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the

Complaint.

156. Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132,

prohibits a public entity from excluding a person with a disability from participating in, or

otherwise benefiting from, a program of the public entity, or otherwise discriminating against a person on the basis of disability:  "No qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

157.   The term "disability" includes physical and mental disabilities that substantially limit one or more major life activities.  42 U.S.C. § 12102(2).  A "qualified individual with a disability" means an "individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  42 U.S.C. § 12131(2).

158.   The Plaintiffs, members of organizational Plaintiff DIA, and members and constituents of organizational Plaintiff BCID are persons with disabilities within the meaning of the statute in that they have impairments which substantially limit one or more major life activities, such as walking.  They are also qualified in that they are located in New York City and thus are eligible to benefit from the City's public safety and community programs operated out of New York City police stations.  Individual Plaintiffs. members of organizational Plaintiff DIA, and members and constituents of organizational Plaintiff BCID are qualified individuals with disabilities within the meaning of 42 U.S.C. §§ 12102, 12131 and 28 C.F.R. § 35.104.

159.   A "public entity" includes state and local governments, their agencies, and their instrumentalities.  42 U.S.C. § 12131(1).  Defendants New York City and the New York City Police Department are public entities within the meaning of 42 U.S.C. § 12131 and 28 C.F.R. § 35.104.

160.    Title II of the ADA requires public entities, including Defendants, to operate each of their programs, services or activities "so that, when viewed in its entirety, it is readily accessible to and useable by individuals with disabilities." 28 C.F.R. § 35.150; *see also* 28 C.F.R. §§ 35.149 & 35.151.

161.    Public safety programs represent a vital program, service, or activity.  Yet Defendants have failed to provide persons with mobility disabilities meaningful access to their public safety and related programs at the police stations, in violation of Title II of the ADA. Defendants have also failed to operate their public safety and related programs in the police stations so that they are readily accessible and usable by persons with mobility disabilities when viewed in their entirety, in violation Title II of the ADA.

162.    The regulations implementing Title II of the ADA also require a public entity to maintain the features of all facilities required to be accessible under the ADA.  28 C.F.R. § 35.133.  Facilities required to be accessible include buildings, structures, or sites where the facilities are located.  *See* 28 C.F.R. § 35.104.

163.    Defendants have failed and continue to fail to maintain accessible features at their police stations, including failing to ensure that the bathrooms are accessible, failing to provide reception desks at wheelchair-accessible heights, failing to provide reasonable alternative accessible routes, and failing to provide signage for these accessible routes, among other failures to maintain accessible features of such facilities, in violation of Title II of the ADA.

164.    As a direct and proximate result of the aforementioned acts, Plaintiffs have been and continue to be injured.

165.     Defendants' conduct constitutes an ongoing and continuous violation of Title II of the ADA and, as a result, Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable attorneys' fees and costs.

WHEREFORE, Plaintiffs pray for relief as set forth below.

<div align="center">

**SECOND CAUSE OF ACTION**
**VIOLATION OF SECTION 504 OF THE REHABILITATION ACT OF 1973**
**(29 U.S.C. § 794, ET SEQ.)**

</div>

166.     Plaintiffs re-allege and incorporate herein all previously alleged paragraphs of the Complaint.

167.     Section 504 of the Rehabilitation Act provides that "[N]o otherwise qualified individual with a disability  . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance . . ." 29 U.S.C. § 794.

168.     The statute defines an "individual with a disability" as "an individual who has a physical or mental impairment that substantially limits one or more major life activities of such individual." 29 U.S.C. § 705(20)(B) (referencing 42 U.S.C. § 12102); see also 28 C.F.R. § 39.103.  Individual Plaintiffs, members of organizational Plaintiff DIA, and members and constituents of organizational Plaintiff BCID are otherwise qualified individuals with disabilities within the meaning of the statute in that they have impairments which substantially limit one or more major life activities, such as walking, and have reason to and are otherwise eligible to participate in Defendants' public safety and related programs at police stations throughout the City.

169.    Defendants New York City and the NYPD receive federal financial assistance for their public safety and related programs adequate to invoke the coverage of Section 504 and have received this assistance at all relevant times to the claims asserted in this Complaint.

170.    Congress has decreed that the United States Department of Justice ("DOJ") regulations promulgated to implement the ADA shall be consistent with those regulations implementing Section 504. 42 U.S.C. § 12134; 28 C.F.R. § 35.103(a).

171.    Plaintiffs re-allege and incorporate into the Second Cause of Action the allegations in their First Cause of Action concerning DOJ regulations implementing the Title II of the ADA and Defendants' violation thereof.

172.    Defendants and their agents and employees have and continue to violate Section 504 and the regulations promulgated thereunder by excluding Plaintiffs from participation in, denying the Plaintiffs the benefits of, and subjecting Plaintiffs based solely by reason of their disabilities, to discrimination in the services and activities of Defendants' public safety and related programs operated out of their police stations, including essential public safety functions, such as refuge for people who feel unsafe or a place to report a crime, and the precincts' monthly Community Council meetings and miscellaneous programs, like turn-in days for expired medications, permit applications, and vehicle registration.

173.    As a direct and proximate cause of the aforementioned acts, Plaintiffs have been and continue to be injured.

174.    Defendants' conduct constitutes an ongoing and continuous violation of Section 504 and, as a result, Plaintiffs are entitled to declaratory and injunctive relief as well as reasonable attorneys' fees and costs.

WHEREFORE, Plaintiffs pray for relief as set forth below.

**THIRD CAUSE OF ACTION**
**VIOLATION OF THE NEW YORK CITY HUMAN RIGHTS LAW**
**(N.Y.C. ADMIN. CODE § 8-101 ET. SEQ.)**

175.    Plaintiffs re-allege and incorporate herein all previously alleged paragraphs in this Complaint.

176.    The New York City Human Rights Law ("NYCHRL") is a sweeping anti-discrimination statute enacted for the purpose of eliminating "prejudice, intolerance, bigotry, and discrimination" in public accommodations.  N.Y.C. Admin. Code § 8-101.

177.    The NYCHRL was amended in 2005 for the specific purpose of clarifying that the scope of the law should not be limited by cramped interpretations of similar federal and state laws, but should instead be "construed liberally for the accomplishment of the uniquely broad and remedial purposes thereof, regardless of whether federal or New York State civil and human rights laws, including those laws with provisions comparably-worded to provisions of this title, have been so construed," for the purpose of providing maximum protection to people with disabilities and other groups that face discrimination.  N.Y.C. Admin. Code § 8-130.

178.    Under the NYCHRL, "[i]t shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation because of the actual or perceived . . . disability . . . status of any person directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . ." N.Y.C. Admin. Code § 8-107(4)(a).

179.    The term "person" includes governmental bodies or agencies.  N.Y.C. Admin. Code § 8-102(1).  New York City and the NYPD are both governmental bodies or agencies and thus persons within the meaning of N.Y.C. Admin. Code § 8-102(1).  As Police Commission of

the NYPD, Defendant O'Neill is being sued in his official capacity as the chief executive of a governmental body or agency.

180.    The term "place or provider of public accommodation" includes "providers, whether licensed or unlicensed, of goods, services, facilities, accommodations, advantages or privileges of any kind, and places whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages or privileges of any kind are extended, offered, sold or otherwise made available." N.Y.C. Admin Code § 8-102(9). The NYPD's public safety and related programs at the City's police stations throughout New York City constitutes a public accommodation as it is a service, accommodation, advantage, or privilege offered to the general public and thus falls within the meaning of N.Y.C. Admin Code § 8-102(9).

181.    Defendants, as persons under the statute, act as the "managers" of the City's public safety program at police stations—a public accommodation. In so doing, the City, the NYPD, and Defendant O'Neill directly and indirectly deny to persons with disabilities the accommodations, advantages, facilities or privileges of the public safety and related programs at the City's police stations for the reasons set forth herein.

182.    The NYCHRL additionally requires that any person prohibited from discriminating under Section 8-107 on the basis of disability "shall make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." N.Y.C. Admin. Code § 8-107(15). The term "covered entity" is defined as a person required to comply with any provision of Section 8-107, which includes Defendants under N.Y.C. Admin. Code § 8-102(1).

183.    The NYCHRL also forbids policies and practices of covered entities that result in the systemic discriminatory exclusion of persons with disabilities, such as the exclusion of persons with disabilities from police stations throughout the City.  N.Y.C. Admin. Code § 8-107(17).

184.    The City of New York, the NYPD, and Defendant O'Neill in his official capacity qualify as covered entities and must make the reasonable accommodations necessary to allow persons with disabilities the opportunity to enjoy the right of benefiting from the City's public safety and related programs pursuant to N.Y.C. Admin. Code § 8-107(15).  Defendants have made inadequate or no reasonable accommodations to allow persons with disabilities the opportunity to enjoy the right of benefiting from the City's public safety and related programs at City police stations.

185.    As a direct and proximate result of Defendants' violations of the NYCHRL, Plaintiffs have been injured as set forth herein.

186.    Defendants' conduct constitutes an ongoing and continuous violation of the NYCHRL and, unless restrained from doing so, Defendants will continue to violate said law. This conduct, unless enjoined, will continue to inflict injuries for which Plaintiffs have no adequate remedy at law.  Plaintiffs will suffer irreparable harm in that they will continue to be discriminated against and denied the accommodations, advantages, facilities or privileges of the City's public safety and related programs throughout New York City as well as reasonable accommodations which would provide them the opportunity to benefit from the City's public safety and related programs as carried out at police stations throughout New York City. Consequently, Plaintiffs are entitled to injunctive relief and reasonable attorneys' fees and costs.

WHEREFORE, Plaintiffs pray for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows, including but not limited to:

187.    A declaration that Defendants' conduct as alleged herein in operating the City's public safety and related programs at NYPD stations has violated and continues to violate Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the New York City Human Rights Law;

188.    An order and judgment enjoining Defendants from violating Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the New York City Human Rights Law, and requiring Defendants to develop and implement a remedial plan to remedy such failures in order to provide meaningful access to the City's public safety and related programs at police stations.  At a minimum, Plaintiffs request that Defendants be enjoined to take the following actions:

a.    Ensure that the City's public safety and related programs at the police stations, when viewed in their entirety, are readily accessible and usable by persons with mobility disabilities;

b.    Undertake prompt remedial measures to eliminate physical barriers to access to the police stations to make such facilities accessible to Plaintiffs in accordance with federal accessibility standards;

c.    Maintain any existing accessible features of the police stations so that such features provide full usability for persons with mobility disabilities;

d.    Ensure that all future new construction and alterations to the police stations result in the provision of facilities that are fully compliant with federal accessibility standards.

189.    Plaintiffs' reasonable attorneys' fees and costs; and

190.    Such other and further relief as the Court deems just and proper.

Dated:  October 27, 2016
       New York, New York

Respectfully submitted,

DISABILITY RIGHTS ADVOCATES

_____
Michelle A. Caiola (MC2110)
Rebecca J. Rodgers (RR1349)
DISABILITY RIGHTS ADVOCATES
675 Third Avenue, Suite 2216
New York, NY 10017
Tel:  (212) 644-8644
Fax:  (212) 644-8636
mcaiola@dralegal.org
rrodgers@dralegal.org


Sid Wolinsky*
DISABILITY RIGHTS ADVOCATES
2001 Center Street, Fourth Floor
Berkeley, CA 94704-1204
Tel: (510) 665-8644
Fax: (510) 665-8511
Email: swolinsky@dralegal.org

*Attorneys for Plaintiffs*

* Motion to Appear *Pro Hac Vice* Pending