```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   DISABLED IN ACTION,

 4                    Plaintiff,

 5           v.                              16 CV 8354 (VEC)

 6   CITY OF NEW YORK, et al.,

 7                    Defendants.

 8   ------------------------------x
                                            New York, N.Y.
 9                                          May 5, 2017
                                            10:35 a.m.
10
     Before:
11
                        HON. VALERIE E. CAPRONI,
12
                                            District Judge
13
                               APPEARANCES
14
     DISABILITIES RIGHT ADVOCATES
15        Attorneys for Plaintiffs
     BY:  MICHELLE ANNE CAIOLA
16        REBECCA JULIET RODGERS

17   NEW YORK CITY LAW DEPARTMENT
     OFFICE OF THE CORPORATION COUNSEL
18        Attorneys for Defendants
     BY:  STEPHEN EDWARD KITZINGER
19        CAROLYN ELIZABETH KRUK
          MARK GALEN TOEWS
20

21

22

23

24

25
```

1        (Case called)

2        THE COURT:  You are?

3        MS. RODGERS:  Rebecca Rodgers.

4        MS. CAIOLA:  Michelle Caiola.

5        MR. TOEWS:  Mark Toews.

6        MS. KRUK:  Carolyn Kruk.

7        MR. KITZINGER:  Steven Kitzinger.

8        THE COURT:  Let me say that I was really hoping that

9   the parties would be much closer on how to proceed with this

10  case.  Let me start with my question to the plaintiffs.

11       Why do you need to survey 25 police precincts?  As you

12  told me last time, it strikes me that the critical path issue

13  is whether the city has to make all of its precincts accessible

14  or whether it can provide access to its programs with less than

15  100 percent accessibility.  Correct?

16       MS. CAIOLA:  Yes.  That's part --

17       THE COURT:  Isn't that the critical path issue?  The

18  reason I say it's critical path is if I rule against you on

19  that and I say, no.  It doesn't have to be 100 percent, then

20  we're in a different sort of branch, which is okay.  Do they

21  have enough accessibility that they provide access to their

22  programs.

23       That may yield different discovery than if I agree

24  with you that 100 percent of the precincts have to be

25  accessible in order for them to comply with the ADA.

1          MS. CAIOLA:  Let me start with the fact that our

2     second cause of action is under the New York City Human Rights

3     Law, and there is no program accessibility defense there at

4     all.  Under the New York City Human Rights Law, every facility

5     needs to provide access.

6          THE COURT:  Of course, if I found against you on the

7     ADA, I might decide not to keep the city claim.

8          MS. CAIOLA:  Understood.  Under the ADA as well, while

9     program access is a defense, they're not going to prevail in

10    this case for several reasons.  One is they're not going to be

11    able to show that it's a program access, meaning that there's

12    something they're providing over all that's not specific to the

13    precincts.

14         THE COURT:  That's your position.  They have a

15    different position.

16         MS. CAIOLA:  That's our position.  I mean, why would

17    there be 77 precinct houses?  Have you ever tried to report a

18    crime at a station and they tell you you have to go somewhere

19    else.

20         THE COURT:  You're trying to argue the merits.  I'm

21    trying to figure out how we can cut to the chase.  Because if

22    you're right, then don't you want to get them on the path to

23    making these stations accessible sooner rather than later?

24         MS. CAIOLA:  Absolutely.  If we could go into a

25    settlement mode where we all knew we were settling it because

1  they were going to allow a survey of all stations and undergo

2  remediation to make each station accessible --

3          THE COURT:  If they want to surrender.

4          MS. CAIOLA:  Every public entity was charged with

5  creating a self-assessment and transition plan to bring

6  themselves into compliance.  Every program, every department.

7  They have not.  At least they haven't produced one.

8          THE COURT:  That's why you sued them.

9          MS. CAIOLA:  That's part of why we sued them.  It just

10  goes to show that we're going to need to proceed and show how

11  inaccessible every station is.

12          THE COURT:  No, you don't.

13          MS. CAIOLA:  We're talking about surveying one third

14  of the stations.  We think we're going to need that to prove

15  our legal point, how inaccessible they are.

16          THE COURT:  Why?

17          MS. CAIOLA:  Because they want to say they don't need

18  to have every station accessible.  We're going to show you

19  there are adjacent precincts, and there are miles and blocks

20  between accessible stations.

21          They can't possibly be providing program accessibility

22  by having a station here or there that's accessible.  I don't

23  know how we show that without showing the level of

24  inaccessibility, unless they want to stipulate to it.

25          THE COURT:  What I'm suggesting is to try to take a

1    baby step, which if I agree with you, is going to make their

2    situation -- they're going to have to come to the table and

3    talk settlement.

4         Because if I say they're wrong about that they can

5    provide less than 100 percent accessibility under the ADA, as

6    long as they provide program accessibility, if I say no, the

7    law says you have to provide all the precincts have to be

8    accessible.  They then either have to appeal or have to talk

9    settlement.

10        Now, I feel like this is Groundhog Day.  This is the

11   same conversation we had a month ago.  If that's the case, I'm

12   not sure why you need a whole lot of discovery on that discreet

13   legal issue, which is critical path, because if they lose that

14   issue, they're going to be willing to talk settlement.

15        Because then what we're going to be talking about is

16   what is the plan to move from where we are, which is some

17   percentage of precincts are not accessible, to where they need

18   to be, which is 100 percent of all precincts have to be

19   accessible.

20        On the other hand, if I agree with them and say, no.

21   As long as they are providing program accessibility, they are

22   in compliance with the ADA, then your discovery is focused on

23   the very issues you just laid out to me, which is what is the

24   program of the police department and even accepting their

25   crabbed interpretation of the ADA, they're still not in

 1    compliance because there are precincts that have miles and

 2    miles and miles between accessible stations.  That's an

 3    entirely different set of discovery.

 4          I am baffled by why you want to enter into what's got

 5    to be a very costly undertaking of surveying 25 police

 6    precincts before we tee up that critical issue.

 7          MS. CAIOLA:  So, if I understand you, we're concerned

 8    about having enough evidence to show that even if they were

 9    allowed to provide program accessibility, that they are not.

10          THE COURT:  I don't want to litigate that yet.

11          MS. CAIOLA:  So you would like us to do dispositive

12    motions on the issue of what the program is?  Am I getting that

13    correct?

14          THE COURT:  No.  It would be their motion actually, I

15    suppose.

16          Your position is you don't have to provide 100 percent

17    accessibility under the ADA; right?

18          MR. TOEWS:  Correct, your Honor.  Yes.

19          THE COURT:  And that you are providing program access.

20          MR. TOEWS:  Yes, your Honor.

21          THE COURT:  There's going to need to be discovery for

22    that.

23          MR. TOEWS:  I believe there would need to be some

24    discovery, yes.  Just to be clear, we are prepared and ready,

25    as we indicated in our letter, to discuss settlement now.  That

1   was our and is our proposed approach, was that we would simply

2   perhaps -- perhaps "simply" is the wrong word -- but enter into

3   some sort of structured negotiations with plaintiffs whereby we

4   acknowledge that although our position is that we are providing

5   overall program access, that certainly there needs to be some

6   remediations and fixes made to ensure that there are a

7   sufficient number of physically accessible station houses

8   geographically dispersed throughout the city.

9        THE COURT:  I don't think they're willing to negotiate

10  on that basis.

11       Are you?  At this stage.

12       MS. CAIOLA:  We don't know what's out there.  That's

13  partly why we're looking.  So it would be very hard.  How would

14  we agree on how many stations need to be accessible and which

15  can be made accessible and which cannot be, which you've looked

16  at?  We haven't seen any self-assessment.  We haven't seen any

17  transition plan.  So we don't know what they would be

18  contemplating.

19       MR. KITZINGER:  If I may, your Honor.  I think we

20  could look at maps of each patrol burough, come up with a plan.

21  As part of the settlement discussion, we could come up with a

22  plan, identify the station houses that either are or will be

23  made accessible, and have appropriate policy procedures put in

24  place, if they're not already in place, to allow for program

25  access through the use of the identified station houses.

1          If we said a station house we identified cannot be

2     reasonably made accessible, we would substitute one or more

3     station houses to ensure accessibility.  That would go a long

4     way towards making any of the surveys done useful going forward

5     and trying to resolve the case more in the global sense.

6          THE COURT:  Let me make sure I understand.  You're

7     proposing that you would be willing to talk settlement on a

8     less than 100 percent accessibility.

9          MR. KITZINGER:  Yes, your Honor.

10         THE COURT:  Are you prepared to talk settlement on

11    that as kind of a core base understanding?

12         MS. CAIOLA:  No, your Honor.  Each precinct is unique,

13    geared towards each neighborhood.

14         MR. KITZINGER:  Your Honor, as I recall, last time we

15    were here, Mr. Wolinsky acknowledged that it's likely that

16    given the age of these buildings, more likely than not, one or

17    more will not be able to render it accessible due to technical

18    infeasibility, undue burdens of cost.

19         Therefore, once they've acknowledged that, it's

20    suggested program access can be provided through less than

21    100 percent accessibility, I think the regulations promulgated

22    by DOJ under the Rehab Act explicitly provide that program

23    access may be achieved through means other than making

24    100 percent of every facility accessible by having certain

25    programs in certain locations and other mechanisms.

1          That is what we believe the law requires.  That is

2   what we're prepared to do, to the extent we're not already

3   there.  We would like to move forward on that track because we

4   believe to the extent program access is not presently provided,

5   although we believe it may well be, it would achieve that goal

6   much more rapidly than going down the road of surveying all the

7   station houses in an effort to allow plaintiffs to obtain

8   evidence for a summary judgment motion.

9          MS. CAIOLA:  The legal obligation was to already have

10  surveyed all the houses and to have a transition plan to make

11  as many that could be brought into compliance into compliance.

12  Clearly that has not happened.  So it's very hard for the

13  plaintiffs to believe that that's going to happen under some

14  kind of settlement where we don't understand the level and

15  extent of the inaccessibility.

16         MR. KITZINGER:  Your Honor, if your autograph is on a

17  document, I think it's pretty clear that the police department

18  of the city of New York will comply with its terms and

19  obligations.  I think suggesting otherwise is somewhat

20  disingenuous.

21         THE COURT:  I don't have any problem believing that if

22  you entered into a stipulated agreement settling this case that

23  was so ordered and I maintained jurisdiction and had periodic

24  reports on how the city was doing, that they wouldn't comply

25  with it.

1        If they fell out of compliance, I have complete

2   confidence that I would have a lawyer from your organization in

3   front of me jumping up and down.  So I'm not too concerned

4   about getting them into compliance.

5        What I am concerned about is sending you off for a

6   settlement with the magistrate judge if there is not

7   willingness on both sides to talk based on the general

8   parameters that the city has laid out.

9        MS. CAIOLA:  I don't understand how we would arrive at

10  the point to decide which stations they were going to make

11  accessible if they weren't surveyed.  We've resolved these

12  cases before with the city once regarding polling places, the

13  Board of Elections.

14       We just had a three-year period of remediation renewed

15  because we've had to go through this process after winning our

16  motion to have the polling places surveyed, remediation

17  suggested -- we're in the process of reviewing whether they're

18  being done.  It's a very long process, but that is what it's

19  going to take.

20       We're not willing to just put it in their hands to

21  say, apparently they don't have the information of what's

22  feasible or not because they haven't produced it.  If we had a

23  self-assessment and a transition plan, I think we could start

24  from there, but we don't.  We have nothing.

25       MR. KITZINGER:  Your Honor, if I may.  With regard to

1    the polling place litigation, there are 1,200 locations.  In

2    that instance, you are required to vote in your own polling

3    place because you have a ballot which is specific to where you

4    reside.  That's a very different situation than you have here.

5    There's also a much greater number.  There's much less control

6    over the facilities.

7          THE COURT:  Let me ask you something.  In that

8    litigation did you survey all 1,000 polling places before you

9    moved for summary judgment?

10         MS. CAIOLA:  No.

11         MR. KITZINGER:  That's the reason the Board of

12   Elections consented to extending jurisdiction, because the

13   third-party expert who is surveying the facilities has not yet

14   completed all the surveys because there are so many and it

15   takes a long time.

16         As I said before, your Honor, what we suggest is we

17   identify the station houses, and to the extent the station

18   houses cannot be rendered accessible reasonably, another

19   station house would be selected to be made accessible so that

20   nobody would have to travel too far.

21         THE COURT:  So you would start out the settlement

22   discussions saying these are the 20 precinct houses or

23   whatever.

24         MR. KITZINGER:  We would sit down with a map and

25   jointly select them.  We could put them together.  We could

1    come up with a plan.  They could opine on it.  We think maybe

2    moving forward under the guidance of a magistrate judge would

3    expedite that process.  I think it's Magistrate Judge Peck.  He

4    usually moves things along very quickly.

5              MS. CAIOLA:  Our plaintiffs have stories.  A child --

6              THE COURT:  No.  Are you willing to enter into a

7    discussion on those basic parameters or not?  Quit trying to

8    sell me your case.  I understand your case.  I'm sympathetic to

9    your case, but you're annoying me.

10             I'm trying to get from where we are now to where

11   either you win your basic point that 100 percent have to be

12   accessible or they prevail on their basic point, which is they

13   don't have to be 100 percent accessible.

14             You don't have to keep selling me on disabled people

15   ought to be able to get into the police precinct.  Are you

16   willing to discuss a settlement on the basic parameters that

17   the city has laid out?

18             MS. CAIOLA:  Respectfully, your Honor, we would

19   request to be allowed to engage in the discovery practice of

20   figuring out --

21             THE COURT:  So no.

22             MS. CAIOLA:  -- the level of accessibility.

23             THE COURT:  So no.

24             MS. CAIOLA:  We're not willing to take a list of 20

25   self-selected stations --

 1          THE COURT:  That is not what he said.  What he said is

 2   he's willing to sit and talk.  You can both pick precincts.

 3   That's about as collegial and as collaborative a proposal as

 4   I've heard from the city.  So either you're not listening or

 5   you don't want to be collaborative on this.

 6          MS. CAIOLA:  We would like the city to proceed with

 7   making every police station accessible to the extent feasible.

 8          THE COURT:  I hear that they are uninterested in

 9   talking settlement.

10          Why do you need 25?

11          MS. CAIOLA:  That's approximately one third, and it

12   addresses the program accessibility issue.  If they're going to

13   provide program accessibility, they're going to need a certain

14   percentage of the precincts that are accessible.

15          THE COURT:  Do you have a view on the 25?  It seems

16   like an awful lot to me.

17          MR. KITZINGER:  Your Honor, it seems like a lot.  We

18   don't know how they intend to select them.  It's been indicated

19   to us previously that they intend to select them from gathering

20   evidence from their summary judgment motion as opposed to

21   identifying whether it's program access in a more global sense.

22          THE COURT:  I'm sorry.  I did everything within my

23   power to try to get to a cheaper way.

24          MR. KITZINGER:  Absolutely, your Honor.

25          THE COURT:  Trust me.  I will remember this in

```
 1    attorneys' fees litigation, that you have chosen not to go a

 2    route that may be more efficient and speedier.  That's not what

 3    you want to do.  My question is:  Your letter told me that

 4    there was a selection of 25.  Has that selection been given to

 5    the city?

 6              MS. CAIOLA:  Yes, and they agreed.  On the stations,

 7    no.  But they agreed to 25.

 8              THE COURT:  I didn't see an agreement to 25.

 9              MS. CAIOLA:  The parties agreed to 25.

10              MR. KITZINGER:  Your Honor, they served a notice to

11    enter and inspect.  We did not move to quash it completely.  We

12    objected to it.  Your Honor has indicated that some level would

13    need to be made available to inspect.  If they are insisting on

14    25, I don't know that we can --

15              THE COURT:  It seems excessive to me.

16              Have you agreed on an expert yet?

17              MS. CAIOLA:  I do not believe we can agree on one.  We

18    have passed names.  They believe our experts -- they don't find

19    them acceptable, and their experts are basically doing many

20    projects for the city.

21              MR. TOEWS:  That's not how we view it.  We thought

22    that we had an agreement with plaintiffs' counsel that we would

23    each designate two additional conflict-free experts and propose

24    them to each other, which we did.  We proposed two.  We were

25    told that they essentially didn't like our choices.
```

1         There was no conflict.  Mr. Wolinsky said he didn't

2    think it would be good for plaintiffs' case essentially.  So it

3    seems like we're probably not going to be able to agree on a

4    joint expert.

5         MR. KITZINGER:  There's another issue.  Plaintiffs

6    indicated that they intend to unilaterally select the station

7    houses to be surveyed without input or involvement from

8    defendants.

9         We did not think that would be an appropriate use of

10    city funds, to survey random station houses without an eye to

11    obtaining usable information to the extent that station houses

12    need to be remediated to be made accessible because we can be

13    surveying ones that are simply not part of a program access

14    plan.

15         THE COURT:  I'm not sure that I understand that.

16         MR. KITZINGER:  As I suggested, an approach of

17    settlement and resolution of this matter is we would identify

18    station houses that would provide program access.  Those would

19    be the ones that we would survey.

20         THE COURT:  They disagree with that whole premise.

21         MR. KITZINGER:  Plaintiffs have not indicated how they

22    intend to identify which station houses are to be surveyed

23    except that they intend to choose them to obtain the best

24    evidence for their summary judgment motion.

25         THE COURT:  Right.  That would normally be a

1    plaintiff's approach.

2            MR. KITZINGER:  To the extent that we believe we're

3    going to do it jointly, we should be involved in the selection

4    process.  We should select them with an eye towards a map to

5    provide program access.

6            To the extent that remediation needs to be done at one

7    or more of the station houses, we would then have the

8    information and be able to attack the problems and remove the

9    barriers that were identified.

10           THE COURT:  They seem more interested in litigating

11   than getting to a speedy resolution.

12           MR. KITZINGER:  Unfortunately, that seems to be the

13   case, your Honor.

14           THE COURT:  If you think that there are precinct

15   houses that are not on their list that are going to be useful

16   to you in arguing that we can provide program access because

17   there are these 20 precinct houses that the plaintiffs didn't

18   look at, then that's what you put forward.

19           MR. KITZINGER:  Absolutely, your Honor.  We're going

20   to have to do that.

21           THE COURT:  I think you're going to have to do that.

22   It's unfortunate that the parties cannot agree on an expert.

23   It would be extremely useful to the Court if there is a single

24   expert that is acceptable to both sides.

25           MS. CAIOLA:  Your Honor, the experts that defendants

 1    put forth are working on defense matters for the city.

 2            THE COURT:  I thought they said they put forward two

 3    that are not working on anything for the city.

 4            MR. KITZINGER:  That's not true, your Honor.  In fact,

 5    one of the experts we put forward I believe was the architect

 6    on this building, this renovation.

 7            MS. CAIOLA:  Urban Architects is representing you

 8    regarding the inaccessibility of Rikers Island and worked

 9    closely on other matters.  The Stephen Jacobs Group has been

10    doing work with you on city libraries and schools.

11            In other words, this is someone that the city goes to

12    often.  So they have an intent to remain someone that you

13    employ.  That creates a conflict.  You've used the same

14    regarding ours.  We have perfectly good, qualified experts that

15    worked on both sides of the table.  We would welcome taking a

16    second look at our experts.

17            MR. TOEWS:  The issue with the expert that the

18    plaintiff proposed was that there was an active conflict.  They

19    were serving as an expert for plaintiffs in a case where they

20    were opposing, where they were adverse to the city in an active

21    case.  That's different than saying that they have done work

22    for the city at some point in the past.

23            MS. CAIOLA:  They surveyed the sidewalks, the work was

24    done, and it was submitted with a summary judgment motion to

25    say that the sidewalks are not in compliance.  That's not

1    really active work.  They did a project for us.

2          THE COURT:  I'm going to make one last pitch.  Why

3    don't you pick your favorite expert, you pick your favorite

4    expert, and charge them with picking a third expert that they

5    both like.  Consider that one.

6          MS. CAIOLA:  Charge our experts?  I'm sorry.  I

7    misunderstood.

8          THE COURT:  You ask your favorite expert and they ask

9    their favorite expert to meet with each other like picking a

10   neutral arbitrator.  They pick a third party who is acceptable

11   to both of them.

12         MR. TOEWS:  We will certainly talk to our clients

13   about that.  I know they had some misgivings about sharing an

14   expert in the event that we would not have input into the

15   locations of the precincts that were surveyed.

16         THE COURT:  I see those as different issues.

17         MS. CAIOLA:  How about the expert that's doing the

18   surveys in the Board of Elections case?  Our parties have

19   agreed to use that.

20         MR. KITZINGER:  We haven't contacted them to see if

21   they even have the capacity to do the poll sites and the

22   shelters.

23         MS. CAIOLA:  If it's 25 stations, and it's the public

24   areas.  It's entrances, bathrooms, lobby areas, interview

25   rooms.  It's not a large lift.  We could check that out.

 1          THE COURT:  Would that person be acceptable to you?

 2          MS. CAIOLA:  Yes.

 3          THE COURT:  If that person would also be acceptable to

 4    the city, check and see if he can do it or she or it.

 5          MR. KITZINGER:  We will check with our clients.

 6          THE COURT:  If not, you've got a week to let the

 7    plaintiffs know whether that expert is acceptable.  Otherwise,

 8    you're on your own.  You're each going to hire your own expert.

 9    Again, lots of money that seems to me not the best way of

10    spending money.  So be it.  One week on that.

11          What's the story with production of documents?

12          MR. TOEWS:  We supplemented our response yesterday,

13    your Honor.  We were waiting for the protective order to be

14    signed.

15          THE COURT:  It was signed a couple days ago.

16          MS. KRUK:  They've been produced.

17          MS. CAIOLA:  Although, your Honor, they are schematics

18    and diagrams and construction documents.  We have yet to

19    receive documents such as assessments, transition plans,

20    complaints regarding accessibility, etc.  We have no

21    communications at all, even though we've been in discussions

22    with them.

23          THE COURT:  What do you mean you have no

24    communications at all?

25          MS. CAIOLA:  There is nothing indicating that there's

 1    been any conversation around access.  We know our plaintiffs

 2    have provided complaints, that there have been back-and-forth

 3    on these issues.

 4               THE COURT:  What's the story?

 5               MR. TOEWS:  We did do a search of complaints.  It did

 6    reveal an enormous amount of documents.  It took a very long

 7    time to go through.  It was a search of all of the IAB files.

 8    We used keywords.  It turned up I believe 8,000 IAB files.

 9               THE COURT:  This is in internal affairs?

10               MR. TOEWS:  Yes, your Honor.  I was surprised to learn

11    that myself.  I understand a complaint of any nature, whether

12    it's against a member of service or whether or not it's

13    accessibility, goes through internal affairs.

14               So it has been extremely time consuming.  I would like

15    to have a conversation with plaintiffs and see if we can agree

16    on some revised search terms to try and narrow down the

17    results.

18               MR. KITZINGER:  Your Honor, I would absolutely

19    question the need for such documents.  We think it's excessive,

20    given the burden locating them, identifying them, producing

21    them, given the fact that they will be surveying.  That's where

22    the rubber hits the road.

23               THE COURT:  Why are they relevant if people have

24    complained?

25               MS. CAIOLA:  I believe this is going to go to program

1    access and what is provided at each precinct and how it is

2    unique and related to each neighborhood and the population of

3    each neighborhood that the precinct is in.

4         THE COURT:  The complaints don't go to the population.

5         MS. CAIOLA:  It's going to go to what they were

6    attempting to access.  For example, one of our plaintiffs was

7    upset that she couldn't go to the community neighborhood

8    meetings that were held there on the second floor without an

9    elevator.  So you're going to get those sorts of complaints.

10   She wrote letters.

11        THE COURT:  But you're going to survey these.  So you

12   will find out that there was no elevator and, therefor, that

13   any meeting that was held on the second floor is not

14   accessible.  Why do you need the complaint?

15        MS. CAIOLA:  Because they are going to argue that it's

16   okay to have dispersed precincts accessible without having them

17   all be accessible, and the complaints show why it's important

18   to be able to get into a particular precinct, the various

19   situations that occurred regarding not being able to get into

20   that building that's providing the program of police protection

21   per neighborhood.

22        MR. TOEWS:  I think there's discovery that will

23   demonstrate that in other ways.  They've indicated they intend

24   to take depositions.  Of course, we have no objection to that.

25   That issue is more what programs are offered at each precinct.

1        If somebody claims the entrance is not accessible,

2    again, that will be demonstrated through the survey.  It's a

3    fact.  Either it's accessible or it's not.  Notice is not an

4    issue in this case.  Whether or not somebody has complained I

5    don't believe really is an issue.

6        MS. CAIOLA:  The harm being done to the class is being

7    shown through incidents that have occurred.

8        MR. KITZINGER:  They can testify that they attempted

9    to get into a meeting and such meeting occurred.

10       MS. CAIOLA:  We don't have the names of those people.

11       THE COURT:  But you know who your plaintiffs are.  You

12   know what their complaints are.

13       MS. CAIOLA:  This is a class case.  So it would also

14   provide additional information and additional incidents that we

15   are not yet aware of across boroughs.

16       THE COURT:  How much burden is associated now that

17   you've got it down to 8,000?

18       MR. TOEWS:  There were 8,000, yes.  They've been going

19   through them within an IAB file trying to find a reference to

20   the complaints.  I understand it's very time consuming.

21       THE COURT:  Are they electronic?

22       MR. TOEWS:  They are electronically stored.

23       MS. KRUK:  That's narrowed.  Now it's going one by

24   one, unless we can narrow the search terms that we've used even

25   further.  So we can talk to plaintiffs about that.  We're not

1    getting much of a bang for our buck for 8,000.  It's just too

2    much.

3            MR. TOEWS:  I understand that the complaints that

4    they've located so far, two, were plaintiffs in this case.

5            THE COURT:  Two out of how many documents they went

6    through?

7            MS. KRUK:  4,000.

8            MS. CAIOLA:  These are named plaintiffs representing

9    the class, which is every citizen and visitor in the city.

10   We're talking about the largest law firm in the country.

11           THE COURT:  They found 2 out of 4,000.

12           MS. CAIOLA:  We're talking about the named plaintiffs.

13           THE COURT:  I thought they found two complaints about

14   access.

15           MS. KRUK:  So far, yes.

16           MR. TOEWS:  I was just trying to make the point that

17   it does seem a bit of a futile exercise to comb through

18   thousands of IAB files to identify the plaintiffs in this case

19   who have indicated that they have made a complaint.

20           THE COURT:  This seems you've got a proportionality

21   problem.  What were the search terms?

22           MS. KRUK:  It was a list of 12 terms.  I don't have

23   them handy, but they were things like access, ramp, disability,

24   Americans With Disabilities Act, wheelchair, those things.

25           We've tried to be targeted but broad enough to capture

1   accessibility issues.  It's brought up a lot of obviously not

2   relevant documents that we'd prefer to expend the number of

3   hours that would be required to continue to search on something

4   better, or if we can narrow the terms still, then fine.  We'll

5   turn over the two that we've found, but we're hoping to

6   eliminate some of the hours.

7        THE COURT:  Talk to the plaintiff.  Talk to each

8   other.  If you can't reach an agreement, come back to me

9   because I think there's a serious proportionality problem if

10  4,000 documents yield 2 that are responsive, 2 that you already

11  knew about.

12       MS. CAIOLA:  May we also narrow down whether there

13  have been assessments and surveys of the stations.

14       THE COURT:  Have there been any assessments?

15       MR. TOEWS:  Yes.  We have provided a list of the

16  assessment that was done of the precincts.

17       MR. KITZINGER:  The only documents we've been able to

18  identify from assessments are summary charts.  These

19  assessments were done five years ago by an employee who is no

20  longer with the department.

21       We don't know how the survey exactly was done, whether

22  it was just a checklist, yes.  This is an accessible bathroom.

23  Yes, there's an elevator and whether there is anything more

24  than that because no such documents have been located at all.

25       THE COURT:  Have you turned over whatever you have as

1    to those assessments?

2          MS. CAIOLA:  So that two-page document is the only

3    document you have about feasibility and accessibility?

4          MR. KITZINGER:  That we've identified to this date.

5          THE COURT:  You proposed that you were going to survey

6    25 precincts by the middle of June.  That doesn't seem

7    realistic to me.  I like short schedules, but that just doesn't

8    seem realistic.

9          MS. CAIOLA:  We spoke to our expert, and they believe

10   they can do multiple stations per day.  We didn't even schedule

11   it that way.  If we do 25 and do one a day, we think that

12   should absolutely work.

13         MR. TOEWS:  That seems very ambitious to us as well.

14   We certainly would not have the capacity or the ability to do

15   more than one per day.  Even one per day seems very ambitious.

16   As Mr. Kitzinger said, we do have experience with plaintiffs'

17   counsel.

18         THE COURT:  Who do you send when the survey is being

19   conducted?

20         MR. TOEWS:  At least initially we would like to be

21   present, the law department.  The police department will

22   designate.  I believe it's in the protective order that the

23   police department will designate a liaison or an escort who

24   will accompany the expert throughout the station houses to

25   those areas that offer programs to the public.  We will ensure

 1   that it runs smoothly and that there is somebody who can escort

 2   the surveyor.

 3          It's obviously a very detailed survey.  It's not

 4   simply eyeballing it.  They need to take very precise

 5   measurements with a level and tape measure and take

 6   photographs.

 7          THE COURT:  About how long do these surveys typically

 8   take?

 9          MS. CAIOLA:  I can't imagine it would be more than two

10   to three hours.  Each station is unique.

11          THE COURT:  You think it's more than that?

12          MS. KRUK:  Based on the experience we have in our BCID

13   litigation --

14          THE COURT:  Which BCID?

15          MS. KRUK:  It involved a challenge to the city's

16   emergency planning and the shelter system for evacuations.  So

17   they're surveying portions of a lot of DOE facilities and

18   schools.

19          It's been very time consuming arranging access and

20   walking them through and making sure they're surveying the

21   right areas -- not that bathroom, this bathroom, all the rest

22   of it.  I think at least in the beginning, it's going to take a

23   lot longer.  Then maybe once we get a better idea of the

24   process, we could do more.

25          MS. CAIOLA:  Even if it is one a day.

1    MS. KRUK:  We'll certainly aim for that, but day after

2    day after day.

3    MR. TOEWS:  Sometimes they need to return to a

4    facility.  They need time to generate the reports.

5    MS. CAIOLA:  We could do it for a few weeks and see

6    how many we could get through.  I think getting access is going

7    to be the main concern on plaintiffs' part.

8    THE COURT:  Your surveys of the police stations are

9    going to be due by the end of the summer.  So by September 1.

10   Work out the schedule between you so that you can get 25 done

11   by the beginning of September, which strikes me as doable.

12   MR. KITZINGER:  Yes, your Honor.

13   THE COURT:  Then you want to take depositions.  Is

14   that correct?

15   MR. TOEWS:  Yes, your Honor.

16   THE COURT:  Both sides?

17   MR. TOEWS:  Yes.  I believe we would like to take some

18   depositions.

19   THE COURT:  You want to take three depositions?  Is

20   that right?

21   MS. RODGERS:  That's correct, your Honor.

22   MS. CAIOLA:  We were talking about initially in

23   preparation for a dispositive motion.

24   THE COURT:  That's what I'm talking about.

25   MS. CAIOLA:  If we're looking at this case broader --

1           THE COURT:  No broader.  A dispositive motion.

2           MS. CAIOLA:  Three to five, your Honor.  We wouldn't

3      necessarily want to wait until the surveys were done.

4           THE COURT:  Do you care?

5           MR. TOEWS:  If the depositions take place before the

6      surveys are completed?

7           THE COURT:  Right.

8           MR. TOEWS:  I think some would probably need to be

9      completed after the surveys are done, but I think there are

10     other individuals that we have identified that could take place

11     while the surveys are being completed.

12          MR. KITZINGER:  We don't know who the plaintiffs would

13     like to depose.  So we don't know what the subject matter would

14     be.

15          THE COURT:  Who do you want deposed?

16          MS. CAIOLA:  We would like a 30(b)(6) to understand

17     the program services and activities that go on at each station.

18     We would like to know about assessments that have been done.

19     We would like to know how accessibility issues have been

20     handled.  We haven't had enough discovery to even know yet who

21     would be in charge of these issues.

22          MR. TOEWS:  We initially identified someone who I

23     believe would be the correct person for that type of

24     deposition, for a 30(b)(6) deposition, somebody who understands

25     the facilities.

1    There has been some turn over at the police

2    department.  I believe it was Lieutenant DeQuatro who has since

3    left.  I understand that he's retired.  There is somebody new

4    in place.  They're getting up to speed.  Certainly we are

5    willing to produce somebody who is able to testify to the

6    programs and how the programs are offered and the facilities

7    themselves.

8                THE COURT:  Do you think all that can be done while

9    the surveys are continuing before you have reports on the

10   surveys?  I'm trying to figure out whether I give you one big

11   deadline or if there's a separate deposition deadline.

12               MR. KITZINGER:  Personally for me, August is tough

13   because I handle all the election litigation for the city.  All

14   of the litigation occurs in the month of August because the way

15   to win is to make sure you're the only one on the ballot in the

16   primary.  That's when the litigation occurs.  It's the first

17   two weeks in August are the Supreme Court.  The following week

18   is the appellate division.  The last week in August is the

19   Court of Appeals.

20               THE COURT:  So the surveys have to be complete and

21   reports presented.  You can tie up all the reports as well by

22   September 1?

23               MS. CAIOLA:  If we're able to get the surveys in and

24   allow the expert time to get a report together.

25               THE COURT:  Let me tell you something.  Normally I do

1    not like to get this involved in discovery.  Having to set how

2    many surveys can take place per week is not what I want to do.

3    Y'all have not given me a lot of confidence that you are going

4    to work well in the sandbox.  So I'm going to set these

5    requirements.  I would much prefer for you to work

6    collaboratively and collegially.

7           What's the maximum amount of surveys you could handle

8    in a week?

9           MS. KRUK:  Could we do September 1 for all the surveys

10   and then the end of the month for the reports to be due?

11          THE COURT:  I think I still need to set how many can

12   be done in a week.

13          MR. KITZINGER:  I think at the beginning, it's likely

14   to be two a week max.  As we work through and get the process

15   moving, I think we can get 25 done by September 1 without

16   difficulty.

17          THE COURT:  I agree.

18          MR. KITZINGER:  Of course, it depends on when they

19   identify the station house.

20          THE COURT:  And the expert and the expert's

21   availability.

22          MR. KITZINGER:  I think once we get rolling -- I think

23   it's going to start quite slowly, but I expect it to ramp up

24   such that we start with two a week for the first couple weeks

25   and then we will work out any issues and get at least three a

1    week done moving forward by July 1.

2            MS. CAIOLA:  It really doesn't seem that we need more

3    than 12 weeks, some weeks doing more, some weeks doing less

4    than two or three a week.  That would allow time for the expert

5    to get the report done.

6            THE COURT:  So all the surveys have to be done by

7    September 1.  You can't schedule more than two per week unless

8    the city agrees.  All of the reports have to be done by the end

9    of September, which is the last working day is September 29.

10            MR. KITZINGER:  Is that when it needs to be produced

11    to the other side?

12            THE COURT:  Yes.  The reports have to be produced.

13            Then fact depositions, fact discovery, depositions,

14    documents, everything needs to be done by the end of October.

15    That's October 31.  I will see you again on November 3.  Talk

16    at that point about whatever expert discovery needs to be taken

17    and a dispositive motions schedule.

18            MS. CAIOLA:  Your Honor, will defendants be providing

19    an expert report as well?

20            MR. KITZINGER:  To the extent we have a separate

21    expert.  We assume everything is mutual.

22            THE COURT:  Those dates are mutual.  Correct.

23            MS. CAIOLA:  And there should be no reason why we

24    can't move forward at any point in time we notice a deposition.

25            MR. TOEWS:  I think it would depend on who the

1   individual is as Mr. Kitzinger said.  I think it may be that

2   having some survey results would be useful for the purposes of

3   a deposition so we sort of understand what areas of the

4   precinct we're talking about, what the full level of

5   accessibility is, what programs are offered where.

6          MS. CAIOLA:  We have a final deadline.  Plaintiffs are

7   ready to start gathering evidence now in a 30(b)(6).  That

8   would assist us.

9          THE COURT:  Assist you in what?

10         MS. CAIOLA:  Understanding all of the parameters of

11  the case.

12         THE COURT:  So notice the deposition.  If you think

13  it's premature, move to quash or call me and tell me that it's

14  premature, and I'll get you on the phone together, and we'll

15  discuss it.

16         MS. CAIOLA:  Thank you, your Honor.

17         MR. KITZINGER:  Thank you, your Honor.

18         THE COURT:  Try to phase the discovery in the most

19  efficient way possible.

20         MR. TOEWS:  We will.  Thank you.

21         THE COURT:  If, however, the parties want to

22  reconsider this approach and figure out a way to get it more

23  quickly teed up, I would be happy to consider that.

24         That's directed at you.  Again, let me stress that if

25  this case gets settled, I'm the one that approves attorneys'

1   fees.

2             MS. CAIOLA:  Understood, your Honor.

3             THE COURT:  Anything further?

4             MS. CAIOLA:  No, your Honor.

5             (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25