USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/4/2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
DISABLED IN ACTION, a nonprofit organization,
BROOKLYN CENTER FOR INDEPENDENCE
OF THE DISABLED, a nonprofit organization,
PAULA WOLFF, an individual, JEAN RYAN, an
individual, EDITH PRENTISS, an individual, and
DUSTIN JONES, an individual, on behalf of
themselves and all other similarly situated,

         Plaintiffs,

    -against-

THE CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT, and JAMES O'NEILL,
in his official capacity as Commissioner of the
New York City Police Department,

         Defendants.
------------------------------------------------------------------X

16-CV-08354 (VEC)

OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

  Disabled in Action of Metropolitan New York and Brooklyn Center for Independence of the Disabled, two nonprofit organizations that provide services and advocacy for people with disabilities, along with Paula Wolff, Jean Ryan, Edith Prentiss, and Dustin Jones, New York City residents with mobility disabilities (collectively, "Plaintiffs"), filed this putative class action against the City of New York, the New York City Police Department, and the Department's Commissioner (collectively, "Defendants"). *See* Dkt. 1 (Compl.)  Plaintiffs allege that the majority of Defendants' seventy-seven police stations throughout New York City contain significant architectural barriers to people using wheelchairs, walkers, and other mobility devices. *See id.* ¶¶ 44-146.  They claim that these barriers exclude people with mobility disabilities from critical public-safety services, programs, and activities in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132; the Rehabilitation Act of

1973, 29 U.S.C. § 794; and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107(4)(a). *See id.* ¶¶ 155-86. Now before the Court are (1) Plaintiffs' motion in limine [Dkts. 87-93] to exclude the testimony of Defendants' proposed expert, architect Antonio Pinto, and (2) Defendants' renewed motion in limine [Dkts. 117-19] to exclude the testimony of Plaintiffs' expert, accessibility inspector Kelly Hang, under Fed. R. Evid. 702.[1] The parties retained these proposed experts to survey the architectural features of a sample of Defendants' stationhouses and opine whether those features comply with the U.S. Department of Justice's 1991 and 2010 ADA Standards for Accessible Design—a prerequisite to assessing whether the condition of the stationhouses causes persons with mobility disabilities to "be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity," 42 U.S.C. § 12132; *see also* 28 C.F.R. pt. 36, app. D (1991 Standards for Accessible Design as Originally Published on July 26, 1991); 28 C.F.R. § 35.151 (first portion of 2010 Standards for Accessible Design for State and Local Government Entities); 36 C.F.R. pt. 1191 apps. B, D (remaining portion of 2010 Standards for Accessible Design for State and Local Government Entities). For the following reasons, Plaintiffs' motion is GRANTED, and Defendants' motion is GRANTED IN PART and DENIED IN PART.

---

[1] In a December 10, 2018 order, the Court found Hang's testimony inadmissible under Fed. R. Civ. P. 37(c)(1) because Plaintiffs failed to disclose information relating to that testimony as required by Fed. R. Civ. P. 26(a)(2). *See* Dkt. 111 at 2-3. The Court held that the failure to disclose was prejudicial; reopened expert discovery to give Defendants an opportunity to question Hang on the topics listed under Rule 26(a)(2); directed Plaintiffs to produce to Defendants all information and materials relating to Hang required by Rule 26(a)(2); struck Defendants' original *Daubert* motion and Plaintiffs' motion for partial summary judgment from the record; and set a schedule for the parties to brief Defendants' renewed motion to exclude Hang's opinions—the motion now before this Court. *Id.* at 3-7. Plaintiffs disclosed the materials required by Rule 26(a)(2) in compliance with the Court's order, *see* Dkt. 122 (Weaver Decl.) ¶ 4, and produced Hang for a second deposition, *see* Dkt. 118 ex. A (transcript excerpts of Jan. 17, 2019 Hang depo.). In their renewed *Daubert* motion, Defendants do not raise further objections under Rule 37 regarding Plaintiffs' compliance with Rule 26.

**DISCUSSION**

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It provides that a person "qualified as an expert by knowledge, skill, experience, training, or education" may offer opinion testimony so long as:

    (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

    (b) the testimony is based on sufficient facts or data;

    (c) the testimony is the product of reliable principles and methods; and

    (d) the expert has reliably applied the principles and methods to the facts . . . .

While the party offering expert testimony bears the burden of establishing by a preponderance of the evidence that the testimony satisfies Rule 702, "the district court is the ultimate gatekeeper." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citations and internal quotation marks omitted). Rule 702 tasks the trial judge with "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). This gatekeeping obligation "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

The threshold question for the Court is whether the "proffered expert testimony is relevant." *Amorgianos v. Nat. R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002). If it is, the Court must then determine "whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered." *Id.* (internal quotation marks omitted). The Supreme Court has laid down several factors pertinent to this inquiry, including "whether a theory or technique . . . can be (and has been) tested"; "whether the theory or technique has been subjected

to peer review and publication"; whether uniform "standards controlling the technique's operation" exist; and whether the theory or technique enjoys "general acceptance" within an identifiable relevant scientific or professional community. *Daubert*, 509 U.S. at 593-94. The Court's ultimate objective is to "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

"To warrant admissibility . . . it is critical that an expert's analysis be reliable at every step." *Amorgianos*, 303 F.3d at 267. "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible," but the "district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Id.* "Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also, e.g.*, *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213-14 (2d Cir. 2009) ("[A] trial judge should exclude expert testimony if it is speculative or conjectural . . . .").

I. **Plaintiffs' Motion to Exclude Opinions of Defendants' Proposed Expert Pinto**

The Court finds that the opinions of Defendants' proposed expert Antonio Pinto are not the product of reliable principles and methods reliably applied. Although the methodology underpinning Pinto's accessibility opinions leaves much to be desired, four particularly glaring

methodological errors lead the Court to conclude that his testimony must be excluded: (1) Pinto's admission that he did not actually measure various building features on whose ADA compliance he purported to provide exact measurements, instead employing what he called an "eye test"; (2) Pinto and his surveying team's apparent failure to adhere to any identifiable and reliable technique for conducting the measurements they in fact undertook; (3) Pinto and his surveying team's arbitrary selection of which architectural measurements to include in their accessibility reports; and (4) Pinto's admission that he at least occasionally based his compliance determinations on outright speculation.

Before discussing each of those shortcomings, the Court notes as a threshold matter that Pinto's testimony and reports are relevant and, if admitted, would "help the trier of fact understand the evidence or . . . determine a fact in issue." Fed. R. Evid. 702(a); *see also Amorgianos*, 303 F.3d at 265 (directing district courts to assess whether "proffered expert testimony is relevant"). Whether the architectural features of Defendants' stationhouses comply with the relevant ADA accessibility standards is both a central question of this lawsuit and one not entirely resolvable by lay persons.[2]

A. Use of the "Eye Test"

As common sense suggests, to assess accurately whether Defendants' stationhouses comply with ADA standards, Pinto and his surveying team had to measure the features of those stationhouses using reliable instruments and then compare the measurements to the relevant ADA accessibility standards. The Court finds that Pinto failed at the first step. At deposition,

---

[2] Lay persons can, without expert assistance, determine whether certain features are ADA compliant. If, for example, every entry to a precinct house is accessible only by stairs, and there is no ramp or other means for a person who is wheelchair-bound to enter, a lay person can conclude that the entrance to the precinct is not ADA-compliant. Nevertheless, other features may not be obviously compliant or non-compliant—e.g., the force needed to open a door.

Pinto conceded that he employed what he called "an eye test" in measuring various architectural features of Defendants' stationhouses, including, for example, the uniformity of stair risers and treads. *See* Dkt. 93 ex. 2 (transcript excerpts of Pinto depo.) at 109-10 ("Q. How do you know that [the stair risers and treads] were uniform if you did not measure all of them? A. There's an eye test. You can tell in the most part that they're all—"). Measurements produced using an "eye test," however, are not measurements at all: they are mere guesses, precisely the kind of speculation and conjecture that courts in this circuit have long held inadmissible. *See, e.g.*, *Zerega*, 571 F.3d at 213-14 ("[A] trial judge should exclude expert testimony if it is speculative or conjectural . . . .").

Making matters worse, Pinto also admitted that the "eye test" is accurate only within "one or two inch[es] here or there"—an unsurprising revelation, but one that defeats Pinto's insistence that his "eye test" is reliable because he "ha[s] a very good eye for seeing measurements" and "[a]fter years at looking at things," he "can tell whether something is three feet or 4 feet without even a measurement." Dkt. 93 ex. 2 (transcript excerpts of Pinto depo.) at 110. While Pinto's "eye test" may be fine for many aspects of his job, "the difference between compliance and noncompliance with the standard of full and equal enjoyment established by the ADA is often a matter of inches." *Chapman v. Pier 1 Imps. (U.S.) Inc.*, 631 F.3d 939, 945-46 (9th Cir. 2011) (en banc). It follows that a methodology for measuring ADA compliance that can be off by "one or two inch[es] here or there," Dkt. 93 ex. 2 (transcript excerpts of Pinto depo.) at 110, is not a reliable methodology under Rule 702. *See Daubert*, 509 U.S. at 594 ("[I]n the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error . . . .").[3]

---

[3] Defendants opposition to Plaintiffs' motion does not comment on, let alone attempt to rationalize, Pinto's reliance on the "eye test."

B. Failure to Adhere to Any Identifiable and Reliable Measurement Techniques

Furthermore, Pinto's surveys of Defendants' stationhouses were performed in significant part by other employees of Urbahn Architects, PLLC, an architectural firm with which Pinto is associated. *See* Dkt. 93 ex. 2 (transcript excerpts of Pinto depo.) at 68-75. Yet Pinto could not say at deposition whether the members of his survey team employed any particular techniques for measuring architectural features to assess their compliance with ADA accessibility standards, let alone whether the techniques his team used are generally accepted as reliable amongst accessibility surveyors. *See Daubert*, 509 U.S. at 594 ("A reliability assessment does not require, although it does permit, explicit identification of a relevant scientific community and an express determination of a particular degree of acceptance within that community." (citation omitted)). Indeed, Pinto conceded that no member of his survey team had been specifically trained in ADA accessibility standards, *see* Dkt. 93 ex. 2 (transcript excerpts of Pinto depo.) at 78-79, and testified that his staff did not always follow his instructions for carrying out surveys of Defendants' stationhouses, *see id.* at 116-18. Given Pinto's own professed penchant for the "eye test," the Court is unable to find on this record that his supervisees made their measurements using reliable methods as Rule 702(c) requires. *See id.* at 110 ("Q. You testified that you were not at this precinct, correct? A. Right. Q. Does your staff have a similar ["]eye for seeing measurement["]? A. No, I would not speak for them."). And the specter of unreliability pervades Pinto's accessibility reports: Pinto's supervisees assisted with each of the twenty-eight precinct surveys he agreed to conduct, and they inspected thirteen of those precincts without Pinto being present. *See* Dkt. 93 ex. 2 (transcript excerpts of Pinto depo.) at 68. Under these circumstances, the Court cannot conclude that Pinto's analysis is "reliable at every step." *Amorgianos*, 303 F.3d at 267.

C. Arbitrariness in Reporting Measurements

Pinto's testimony and reports are unreliable for yet another reason: of those architectural features he and his survey team undertook to measure, they arbitrarily decided which of their resulting measurements to include in Pinto's reports.

At deposition, Pinto testified that he and one of his associates had "developed a survey checklist" listing "all the items that needed to be surveyed" at each stationhouse, including, as Pinto put it, "[e]ach room, stairs, ramps and the criteria that the ADA requires for each of those measurements that are there, for instance, 36 inches between handrails, slope." Dkt. 93 ex. 2 (transcript excerpts of Pinto depo.) at 74, 75-76. Each member of the survey team brought a paper copy of the checklist to each survey and filled it out as he or she measured each stationhouse's architectural features. *Id.* at 76.

This methodology promptly went off the rails, however. Pinto admitted at deposition that his survey team "wrote down measurements that were not included in the survey" reports and that this practice "probably" extended to each stationhouse survey they undertook, though Pinto was unsure. Dkt. 93 ex. 2 (transcript excerpts of Pinto depo.) at 113-14. In fact, Pinto admitted that one of his reports omitted parking-area measurements that were taken during a survey in which he personally participated. *Id.* at 120 ("Q. Were you present at the survey of this police precinct? A. Yes. Q. Did you survey parking areas at this precinct? A. Yes. Q. Where is that in the report? A. It would be in the first four pages. It doesn't appear to be in there. Q. So you surveyed parking areas but you did not include[] them in your report, correct? A. Yes."). When asked *why* measurements he and his team took were not included in the reports, Pinto said that he could not "think of a reason" other than that his staff "might not have written them down" in the first place and that, if so, they were "not following [Pinto's] direction." *Id.* at 115-18. He also

admitted that he himself did not consistently use the checklist he had prepared during the site surveys he attended, *id.* at 78 ("Yeah, sometimes I use photos, note pad, just write down observations. I don't need a checklist in all cases."), an admission that only further muddies the waters.

Given this testimony, it is unclear whether Pinto's survey team (1) measured architectural features relevant under the ADA Standards for Accessible Design but failed to report them, or (2) even worse, failed to measure relevant features altogether. In either case, Pinto's failure to adhere to a coherent standard for including or omitting measurements from his compliance reports suffices to render his opinions unreliable under Rule 702. At deposition, Pinto made clear that he purported to measure—and his reports purported to record—the measurements of "[e]ach room, stairs, ramps and the criteria that the ADA requires." Dkt. 93 ex. 2 (transcript excerpts of Pinto depo.) at 76. But his own testimony shows that he and his associates failed to follow his own chosen methodology for surveying Defendants' stationhouses. Pinto's compliance opinions, which are the results of a methodology that he acknowledges he did not follow, are therefore unreliable and inadmissible under Rule 702. *See, e.g.*, *Amorgianos*, 303 F.3d at 268-69 (affirming exclusion of expert's opinion under Rule 702 where expert "failed to apply his own methodology reliably").

D. Speculation

Finally, at least some of Pinto's opinions are concededly based on sheer speculation. *See, e.g.*, *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) ("[E]xpert testimony should be excluded if it is speculative or conjectural . . . ."). When asked at deposition why one of his reports marked a stationhouse door as compliant with ADA standards regarding the force required to open a door or gate, Pinto opined that the door, which required more force to open

than is allowed for interior doors, was nonetheless compliant because the wall in which the door had been installed was fire-rated. Dkt. 93 ex. 2 (transcript excerpts of Pinto depo.) at 110-13. When asked how he determined that the wall was fire-rated, Pinto conceded that he had, in fact not done so, but had merely assumed as much. *Id.* at 111-13 ("Q. What is the basis for your conclusion that the . . . wall is fire rated? A. I assume that's why I put it as compliant or either that or I made an error. I made a couple of errors within some of the reports I've noticed. It might be that. . . . Q. Did your survey team look at the inside of the door frames to determine whether doors are fire rated? A. No, that was not part of the scope. . . . Q. Did you look at the code compliance drawings? A. Did not. Q. Then you don't have any basis to conclude that any of these walls are fire rated— A. Correct. Q. —do you?").

Given the egregiousness of Pinto's failure to substantiate the assumptions underlying this particular compliance opinion, the Court is unable to conclude that his other opinions are "based on sufficient facts or data," as Rule 702(b) requires. As the party offering Pinto's testimony, it is Defendants' burden to show by a preponderance of the evidence that the whole of his testimony satisfies Rule 702. *Williams*, 506 F.3d at 160. But Defendants do not comment on, let alone offer any justification for, Pinto's election to rest a compliance opinion on what he admitted was pure conjecture. Nor have they satisfied the Court that Pinto's other opinions are not the products of similar unfounded or untested assumptions.

For all these reasons, Pinto's testimony is inadmissible under Rule 702(b)-(d).[4]

---

[4] Because the Court finds Pinto's opinions unreliable for other reasons, it need not address Plaintiffs' contentions that Pinto applied incorrect accessibility standards; that "[m]any of Mr. Pinto's compliance determinations are unsubstantiated" or demonstrably incorrect; and that Pinto's reports feature "many false findings of compliance." *See* Dkt. 88 (Mem. in Supp. of Pls.' Mot. to Exclude Pinto Test.) at 11-16, 23-25. And because the Court excludes Pinto's testimony on the ground that his opinions are unreliable under Rule 702(b)-(d), the Court need not resolve Plaintiffs' separate contention that Pinto does not qualify as an expert on ADA accessibility standards, *see id.* at 18-20. The Court does note serious skepticism, however, of Defendants' assertion that Pinto possesses "extensive specialized knowledge of codes and standards on physical accessibility including the 1991 Americans with Disabilities (ADA) Standards for Accessible Design and the 2010 ADA Standards for Accessible

**II. Defendants' Motion to Exclude Opinions of Plaintiffs' Proposed Expert Hang**

Defendants' renewed motion to exclude the testimony of Plaintiffs' proposed expert Kelly Hang is granted in part and denied in part. Specifically, Hang may offer opinions regarding the compliance (*vel non*) of Defendants' stationhouses with the 1991 and 2010 ADA accessibility standards—the principal subject of her reports and testimony. To the extent, however, that Hang has offered (or intends to offer) any opinion on whether the conditions of Defendants' stationhouses causes individuals with mobility disabilities to "be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by [that] entity," 42 U.S.C. § 12132—the ultimate liability issue in this case—that opinion must be excluded. The Court will address each of these holdings in turn.

    A. Hang's Opinions on Whether Features of Defendants' Stationhouses Comply with the ADA Accessibility Standards

Hang's opinions regarding the compliance (*vel non*) of Defendants' stationhouses with the 1991 and 2010 ADA accessibility standards are admissible under Rule 702. As a threshold matter, these opinions are relevant and would be helpful to the trier of fact in understanding the evidence and determining facts in issue. *See* Fed. R. Evid. 702(a); *Amorgianos*, 303 F.3d at 265. Again, whether the architectural features of Defendants' stationhouses comply with the relevant

---

Design," *see* Dkt. 97 (Mem. in Opp. to Pls.' Mot. to Exclude Pinto Test.) at 5, because it is at odds with Pinto's references during his deposition to the "1994 version" of the "ADA code," which does not exist; his statement that he was unaware of "any industry standards for how to measure facilities for compliance with accessibility laws and guidelines"; and his admission that "ha[d] not seen a copy of the 1991 standards" and had "not used them," Dkt. 93 ex. 2 (transcript excerpts of Pinto depo.) at 42, 46, 48-49, 129-30.

    Moreover, because the Court's ruling on Plaintiffs' *Daubert* motion does not rely on the supportive declaration of Plaintiffs' proposed expert Hang, *see* Dkt. 92, the Court need not resolve Defendants' argument that the declaration must be disregarded because Plaintiffs did not initially disclose it consistent with Fed. R. Civ. P. 37 and 26(a)(2)(D)(ii), *see* Dkt. 97 (Mem. in Opp. to Pls.' Mot. to Exclude Pinto Test.) at 10-11. Given the Court's December 10, 2018 ruling on the Rule 37 issue and its reopening of expert discovery, *see supra* n. 1, this argument appears moot anyway.

ADA accessibility standards is both a central issue in this case and one not completely resolvable by lay persons without expert guidance. The Court is satisfied, moreover, that Hang possesses the knowledge, skill, experience, training, and education necessary to offer expert testimony on the subject—a finding Defendants' renewed motion does not challenge. *See* Dkt. 122 ex. 2 addendum 1 (Hang résumé); *id.* ex. 1 (transcript excerpts of Apr. 12, 2018 Hang depo.) at 7, 11-15 (describing Hang's education, training, and experience).

Finally, Hang's compliance opinions are themselves reliable products of a reliable methodology reliably applied, as Rule 702(b)-(d) requires. Hang and an associate surveyed twenty-five of Defendants' stationhouses, measuring and photographing features relevant to accessibility and comparing the measurements to the ADA accessibility standards. *See* Dkt. 122 ex. 1 (transcript of Apr. 12, 2018 Hang depo.) at 28-29, 36, 40, 56, 61 (describing Hang's methodology); *see also, e.g.*, Dkt. 122 ex. 2 (Hang's 1st Precinct report) at 8-10 (cataloging accessibility barriers on 1st Precinct's exterior). Unlike with Pinto's opinions, the Court sees no reason—and Defendants offer none—to believe that Hang or her associate used unreliable measurement techniques (e.g., any sort of "eye test"); that they unreliably documented their measurements; that they engaged in any speculation or conjecture regarding the architectural features of Defendants' stationhouses; or that Hang incompetently compared her measurements to the relevant ADA standards. Hang's measurements and compliance opinions are therefore admissible under Rule 702.

> B. Hang's Opinions (*Vel Non*) Whether the Conditions of Defendants' Stationhouses Causes Individuals to Be Excluded from NYPD Services, Programs, or Activities

There is some confusion whether Hang has offered an opinion on whether the conditions of Defendants' stationhouses causes individuals with mobility disabilities to be excluded from NYPD's services, programs, or activities, *see* 42 U.S.C. § 12132. Defendants devote their

renewed *Daubert* motion principally to arguing that all of Hang's testimony must be excluded on the ground that her report "effectively asks the Court to take Ms. Hang's word for her opinion that because there are instances of non-compliance with [the relevant ADA standards] at various station houses, the NYPD's services, programs, and activities are inaccessible to persons with mobility impairments." Dkt. 119 (Mem. in Supp. of Mot. to Exclude Hang) at 2, 6-10; *see also* Dkt. 125 (Reply in Supp. of Mot. to Exclude Hang) at 2-3. Plaintiffs respond that the opinion Defendants ascribe to Hang "is not expressed anywhere in Ms. Hang's report." Dkt. 121 (Mem. in Opp. to Mot. to Exclude Hang) at 4-5. It is unclear which side is correct. On the one hand, after examining the only one of Hang's reports the parties have submitted (regarding Hang's survey of the 1st Precinct stationhouse), the Court can find only one reference to the NYPD's "services, programs, or activities," 42 U.S.C. § 12132, and it appears limited to any services offered exclusively on the 1st Precinct's third floor:

> An elevator is not provided in this multi-story building for vertical access to upper floors, which is only achieved by the central staircase. This staircase does not comply with ADAAG/ADAS. The staircase is the only form of access to the Detective Squad Room, the two Interview Rooms, and the two Line-up Rooms on the third floor. <u>Thus, all services open to the public on the third floor are inaccessible</u>, and these rooms were not assessed at the time of my survey.

Dkt. 122 ex. 2 at 7 (emphasis added). On the other hand, at her second deposition, Hang seems to have agreed with Defendants' counsel that her reports *did* purport to opine on whether any of NYPD's programs, services, and activities are inaccessible to individuals with mobility disabilities—the ultimate issue in determining Defendants' liability under Title II of the ADA:

> Q. That report concluded that programs and services and activities offered by the New York City Police Department at the twenty-five facilities you surveyed were generally unavailable because they had barriers to accessibility. Is that right?
>
> A. Yes. Physical barriers to accessibility. Yes.

Dkt. 118 ex. A at 6 (transcript excerpts of Jan. 17, 2019 Hang depo.); *see also* ex. B (transcript excerpts of Apr. 12, 2018 Hang depo.) at 73 (incomplete portion of exchange in which Hang appears to agree that she has offered "an expert opinion that the NYPD is excluding individuals with disabilities from public programs and services"). Because the materials submitted to the Court do not definitively show one way or the other whether Hang has proffered an opinion regarding Defendants' liability under 42 U.S.C. § 12132—a question that, as this Court has already observed, "is distinct from the question whether any of Defendants' police precinct houses are physically inaccessible to individuals with mobility disabilities," Dkt. 107 at 2—the Court will rule on whether Hang may offer an opinion on that issue.

The short answer: she may not. At both depositions, Hang agreed with Defendants' counsel that she did not know what "programs, services, and activities that the NYPD offers and/or delivers" and did not "review any documents as to how those programs, services, and activities are offered or delivered." Dkt. 118 ex. A at 7; *see also* ex. B (transcript excerpts of Apr. 12, 2018 Hang depo.) at 73 ("Q. Did you review any documents with respect to what public programs and services the NYPD offers? A. No. Q. Do you know what programs and services the NYPD offers? A. Not until the survey started, but prior to that, no. . . . Q. Have you spoken with any individuals who claim to have tried but failed to get access to NYPD programs due to disability? A. No."). It is obvious that to reliably opine on whether NYPD's services, programs, and activities are accessible under the ADA notwithstanding architectural barriers at NYPD's stationhouses, an expert must be familiar with the services, programs, and activities NYPD offers. Given Hang's admissions that she is not, any opinions she might offer on this subject— which, again, is separate from the inquiry whether the stationhouses' architectural features comply with the ADA accessibility standards—are "based on data . . . that are simply inadequate

to support the conclusions reached," *Amorgianos*, 303 F.3d at 266; *see also, e.g.*, *Joiner*, 522 U.S. at 146 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). Any such opinions are therefore inadmissible.[5]

This ruling, of course, preserves the bulk of Hang's opinions, which are almost entirely the result, to borrow Defendants' phrasing, "of simply measuring and identifying instances of non-compliance with the ADAAG/ADAS," Dkt. 119 (Mem. in Supp. of Mot. to Exclude Hang) at 9. As Plaintiffs' point out, *see* Dkt. 121 (Mem. in Opp. to Mot. to Exclude Hang) at 5, *these opinions are not a bug but a feature*: they are precisely the kinds of opinions the parties retained their respective experts to provide.

### C. Defendants' Contention of Bias

Finally, the Court rejects Defendants' contention that Hang's "failure (at plaintiffs' direction) to determine whether or not any alleged deviations from ADAS/ADAAG are capable of remediation demonstrates not only an obviously flawed methodology, but also a fundamental bias" in her opinions warranting exclusion. Dkt. 119 (Mem. in Supp. of Mot. to Exclude Hang) at 7-9; *see also* Dkt. 125 (Reply in Supp. of Mot. to Exclude Hang) at 4-5 & n.2. Even if Hang's

---

[5] Because the Court excludes on other grounds any opinion Hang may offer about whether the condition of Defendants' stationhouses causes individuals to be excluded from NYPD services, programs, or activities, the Court need not resolve the parties' dispute over whether any such opinion by Hang improperly fails to account for the feasibility of remediating any architectural barriers at the stationhouses. *See* Dkt. 119 (Mem. in Supp. of Mot. to Exclude Hang) at 7-9; Dkt. 121 (Mem. in Opp. to Mot. to Exclude Hang) at 6. (With respect to Hang's measurements and compliance opinions—which the Court has ruled admissible—whether a structure's existing architectural features comply with the ADA Standards for Accessible Design is an inquiry separate from and antecedent to the question whether remediating any barriers identified is feasible. So any purported failure by Hang to address the latter question does not render her opinions on the former unreliable or otherwise inadmissible.)

For the same reason, the Court also need not address Plaintiffs' contentions (1) that any opinion by Hang on the accessibility of NYPD's services, programs, and activities would be an irrelevant or otherwise inappropriate legal conclusion, *see* Dkt. 121 (Mem. in Opp. to Mot. to Exclude Hang) at 5, and (2) that Defendants' questioning at Hang's second deposition regarding remediation was impermissible, *see id.* at 3 n.3. And finally, the Court need not resolve whether Hang possesses the knowledge, skill, experience, training, and education necessary to opine on the accessibility of NYPD's services, programs, and activities under 42 U.S.C. § 12132.

failure to consider the feasibility of remediation evidenced partiality or bias—and the Court is highly skeptical that it does—it is certainly not bias warranting exclusion under Rule 702. If Defendants believe that Hang is biased and that her opinions therefore ought to be disbelieved, they are welcome to marshal that argument when briefing summary judgment and to cross-examine Hang on the subject if there is a trial.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to exclude the testimony of Defendants' proposed expert Antonio Pinto [Dkt. 87-93] is GRANTED, and Defendants' renewed motion to exclude the testimony of Plaintiffs' proposed expert Kelly Hang [Dkt. 117-19] is GRANTED IN PART and DENIED IN PART. The Clerk of Court is respectfully directed to close docket entries 87 and 117.

Plaintiffs may file a second motion for partial summary judgment no later than **April 5, 2019**. Defendants must file their response to Plaintiffs' motion no later than **May 10, 2019**. Plaintiffs must file any reply in support of their motion no later than **May 24, 2019**.

**SO ORDERED.**

Date: March 4, 2019  
New York, New York

**VALERIE CAPRONI**  
**United States District Judge**