UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
DISABLED IN ACTION, a nonprofit organization,
BROOKLYN CENTER FOR INDEPENDENCE
OF THE DISABLED, a nonprofit organization,
PAULA WOLFF, an individual, JEAN RYAN, an
individual, EDITH PRENTISS, an individual, and
DUSTIN JONES, an individual, on behalf of
themselves and all other similarly situated,

         Plaintiffs,

     -against-

THE CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT, and JAMES O'NEILL,
in his official capacity as Commissioner of the
New York City Police Department,

         Defendants.
------------------------------------------------------------X

16-CV-08354 (VEC)

OPINION AND ORDER

VALERIE CAPRONI, United States District Judge:

  In the thirty years since passage of the Americans with Disabilities Act ("ADA"), the City of New York and NYC Police Department ("NYPD") have made little progress eliminating physical barriers to access to NYPD's police stations. Although NYPD is committed to protecting and serving all New Yorkers, and it appears willing to make additional efforts to do so in a way that is inclusive of those with disabilities, many of its services and programs are currently offered from stations that exclude mobility-impaired individuals. Disabled in Action of Metropolitan New York and Brooklyn Center for Independence of the Disabled, two nonprofit organizations that provide services and advocacy for people with disabilities, along with Paula Wolff,[1] Jean Ryan, Edith Prentiss, and Dustin Jones, New York City residents with mobility

---

[1]  Ms. Wolff died in April 2019. Suggestion of Death (Dkt. 141).

disabilities (collectively, "Plaintiffs"), filed this putative class action against the City, NYPD, and the Department's Commissioner (collectively, "Defendants"). *See* Compl. (Dkt. 1). Plaintiffs claim that pervasive architectural barriers across NYPD's 77 precinct stations exclude people who use wheelchairs, walkers, and other mobility devices from critical public-safety services and programs in violation of Title II of the ADA, 42 U.S.C. § 12132; the Rehabilitation Act of 1973, 29 U.S.C. § 794; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107(4)(a). *See id.* ¶¶ 44–146, 155–86. The issue is difficult and costly, especially from a remedial perspective, not least because of the age of the stations' structures and breadth of benefits NYPD provides city residents.

Plaintiffs have moved for partial summary judgment on liability, pursuant to Federal Rule of Civil Procedure ("Rule") 56. *See* Mot. (Dkt. 128). Laudably, NYPD, since this lawsuit was filed, has taken steps towards meeting its obligations under the ADA. NYPD represents that it will deliver some services directly to individuals and is prepared to and does offer other services from accessible locations, reducing the quantity of services and programs offered to the public only from station houses. But those efforts remain in the early stages of planning and development and are apparently proceeding (inexplicably) without input from critical stakeholders. For the following reasons, Plaintiffs' motion is GRANTED.

## BACKGROUND[2]

Beginning in 2015, NYPD adopted an approach to public safety called "neighborhood policing" that emphasizes local policing and citizen participation. Pls.' 56.1 Stmt. ¶ 97. Two of

---

[2] All facts stated herein are undisputed unless otherwise stated. The Court will refer to the Parties' submissions using the following abbreviations: Plaintiffs' Local Civil Rule 56.1 Statement (Dkt. 139), as "Pls.' 56.1 Stmt."; the Declaration of Meredith J. Weaver in Support of Plaintiffs' Motion (Dkt. 129), as "Weaver Decl."; Plaintiffs' Memorandum of Law in Support of Their Motion (Dkt. 140), as "Pls.' Mem. of Law"; Plaintiffs' Reply Memorandum of Law in Further Support of Their Motion, Dkt. 51, as "Pls.' Reply Mem. of Law"; Defendants' Local Civil Rule 56.1 Counterstatement of Additional Material (Dkt. 145), as "Defs.' 56.1 Stmt."; Defendants' Responses to Plaintiffs' Rule 56.1 Statement (Dkt. 144), as "Defs.' Responses"; Defendants' Memorandum of Law

the goals of "neighborhood policing" are to ensure that "everybody is welcome into the station" and that community members get to know their local police officers. *Id.* ¶ 98. NYPD aspires to create an environment where individuals in the community can "reach out to [officers] at any given time should they need police assistance." *Id.* ¶ 102. Accessibility of stations is meant to be a "huge piece" of this approach. *Id.* ¶ 99. Under neighborhood policing, the relationship between a precinct and the local community is leveraged to improve NYPD's services and programs. *Id.* ¶¶ 101–07.

Each precinct has a citizen Community Council that consists of individuals who live or work in the precinct. *Id.* ¶¶ 111–12. The Community Council serves as a forum for airing local concerns and connecting with officers. *Id.* ¶¶ 113–20. Precincts also host public awareness safety lectures and engage with local clergy (called the Clergy Liaison Program) to identify community issues and help NYPD intervene in community problems at an early stage. *Id.* ¶¶ 121–26; Defs.' 56.1 Stmt. ¶ 371. A precinct is further divided into sectors, and each sector holds regular "Build the Block" community meetings to similarly engage the public. Pls.' 56.1 Stmt. ¶¶ 109–10; Defs.' 56.1 Stmt. ¶ 361-63.

A number of benefits associated with NYPD programs are offered at precinct stations. Sound permit applications must be filed at the station, and parade permit applications, if filed within ten days of the event, must also be filed at the station.[3] Pls.' 56.1 Stmt. ¶¶ 127–29, 250.

---

in Opposition to Plaintiffs' Motion (Dkt. 142), as "Defs.' Mem. of Law"; and Declaration of Deputy Chief Thomas Taffe in Opposition to Plaintiffs' Motion (Dkt. 143), as "Taffe Decl."

[3] Defendants dispute Plaintiffs' 56.1 Statement on this point, and cite to their website in support. *See* Defs.' Responses ¶ 127–29. As to sound permits, the website states that they must be "filed at the precinct" and says nothing about the ability to pick up the permit at an alternate location; the website reports only that the permit is "normally ready for pickup on the day of the event or as directed by the precinct staff."

For parade permits, the NYPD website states: "If the application is made within ten days of the event, the applicant must file the request through the precinct where the parade will take place." Juxtaposed against the online application that is to be completed if the permit is being applied for more than ten days before the event, this would

If an individual loses an accessible parking permit, he or she must obtain an incident report from the station in the precinct where that incident occurred. *Id.* ¶ 130. NYPD runs a Cash for Guns Program, through which individuals can trade a gun for $100; cash payments can only be made at a specific set of stations. *Id.* ¶¶ 131–32; Defs.' 56.1 Stmt. ¶ 369. A similar community program allows individuals to drop off prescription drugs at stations anonymously without being questioned why they had those drugs in the first place (called the Anonymous Prescription Drop Box Program). Pls.' 56.1 Stmt. ¶ 133–34. Community Council meetings and events may also be held at a station. *Id.* ¶ 137; Defs.' 56.1 Stmt. ¶ 364.

Precinct stations provide ad hoc public-safety services: in an emergency, individuals may need to file a complaint, report a crime, seek physical security, or pick up a family member being held in custody. For example, Plaintiff Jones tried to file multiple police reports at the 103rd Precinct station. Pls.' 56.1 Stmt. ¶¶ 222–35. He also has been to his local 48th Precinct station four times to file police reports, one of which related to being a victim of domestic assault. *Id.* ¶¶ 236, 240. Declarant Elizabeth Ramos had to pick up her nephew from police custody at the 63rd Precinct station at night.[4] *Id.* ¶¶ 246–49. Declarant Anthony Trocchia tried to complain at the 94th Precinct station about an officer's conduct. *Id.* ¶¶ 254–57. Declarant Julia Macbeth tried to file a police report and follow up on a complaint at the 70th Precinct station. *Id.* ¶¶ 263–66. Plaintiff Ryan was told to visit the 68th Precinct station to obtain a copy of a police report regarding an incident at her house. *Id.* ¶¶ 139, 146, 149. Plaintiff Prentiss sought help at the 14th Precinct station when she was hit by a metal plate hanging from a truck; and, on a separate

---

appear to require an application to be made at the precinct station. As with sound permits, the website does not mention any ability to pick up a parade permit from somewhere other than at the precinct station.

[4] Ms. Ramos died in July 2018. Pls.' 56.1 Stmt. ¶ 8 n.1.

occasion, she sought to report a hazard to officers at the 26th Precinct station. *Id.* ¶¶ 168–69, 183. Declarant Dayniah Manderson attempted to complete a police report and later follow up at the 47th Precinct station. *Id.* ¶¶ 258, 260.

An uncontested accessibility survey conducted by Plaintiffs' expert shows that access for mobility-impaired individuals is either blocked or hindered at all surveyed stations (25 surveyed out of 77 stations total).[5] *Id.* ¶¶ 21–23. Nine of the surveyed stations can be entered only by way of stairs. *Id.* ¶ 25. From those stations, a person would have to travel between 0.6 and 3.9 miles to reach a station with either a ground-level entrance, an entrance served by a ramp, or an entrance with a lift.[6] *Id.* ¶¶ 27, 30–38. Thirteen of the other 16 surveyed stations are accessible only through side and rear entrances that, although accessible, are non-compliant with federal regulations. Among the non-compliant aspects: they cannot be accessed independently because they must remain locked; they lack signage directing persons to them; they have narrow paths with broken payment; they are obstructed with obstacles like trash and hoses; they are too steep; and they are missing handrails or curbs. *Id.* ¶¶ 26, 39, 44, 57–71. The remaining three surveyed stations have accessible front entrances but either lack signage or have non-compliant doors, thresholds, or slopes. *Id.* ¶¶ 28–29, 45–51. In short, every entrance surveyed by Plaintiffs' expert, which represents roughly one third of all NYPD precinct stations in New York City, have architectural barriers to entry in violation of ADA accessibility standards.[7]

---

[5] On March 4, 2019, the Court granted Plaintiffs' motion *in limine* to exclude Defendants' expert, and granted in part and denied in part Defendants' corresponding motion. *See* Opinion & Order (Dkt. 126) at 16.

[6] The Court grants Plaintiffs' unopposed motion for judicial notice of various Google Maps displaying distances between precinct stations. *See* Mot. (Dkt. 127).

[7] Plaintiffs have also provided undisputed photographic evidence of non-surveyed stations showing that 15 have front entrances served by stairs and nine others have accessible entrances without signage. *See* Pls.' 56.1 Stmt. ¶¶ 41–42.

The interiors of precinct stations also contain extensive accessibility barriers. Bathrooms at virtually all of the surveyed stations are out of compliance with federal regulations. *Id.* ¶ 76. Every surveyed station has doorways and gates that are too narrow, require too much force to open, do not have accessible hardware, do not have sufficient clear floor space, or have thresholds that are too high to comply with federal regulations. *Id.* ¶ 82. Some stairs and ramps have handrails that are mounted incorrectly, are not long enough, or are missing. *Id.* ¶ 83. There is no wheelchair space adjacent to public seating at 18 of the surveyed stations. *Id.* ¶ 84. At the time of the survey, trash, office furniture, and other barriers blocked paths of travel at 15 surveyed stations. *Id.* ¶ 87.

The exterior and interior barriers at precinct stations have impeded and deterred Plaintiffs and putative class members from using NYPD services and participating in its programs. To enter the 14th Precinct station, for example, Plaintiff Prentiss had to find a "Handicap Access" sign to direct her to an accessible entry, pull open a heavy metal gate, traverse a path with broken pavement, open a handle-less door propped open with wood, then navigate hallways that were littered with carts and boxes and that did not direct her to an accessible path to the lobby. *Id.* ¶¶ 170–78. Similarly, at the 26th Precinct station, her path was blocked completely, and she left without seeking assistance. *Id.* ¶¶ 184–86. She has not been able to participate in her Community Council meetings held at the 34th Precinct—her local station—because the meeting room cannot accommodate her wheelchair.[8] *Id.* ¶¶ 187–90. Plaintiff Wolff needed to leave her

---

[8] The Community Council Guidelines require that two of the eight minimum yearly meetings be held at an alternate location other than the primary location; those guidelines also require that individuals attend at least four meetings in a year in order to qualify as members of good standing. *See* Weaver Decl. Ex. 13 at 12, 20. Because some primary locations are not accessible, like the 5th, 18th, 46th, 76th, and 78th Precinct stations, mobility-impaired individuals are precluded from being members in good standing of the Community Council in those precincts. *Compare Precincts*, NYPD, https://www1.nyc.gov/site/nypd/bureaus/patrol/precincts-landing.page (last visited January 28, 2020) *with* Pls.' 56.1 Stmt. ¶ 25; *see also* Pls.' 56.1 Stmt. ¶ 137; Defs.' Responses ¶ 189.

house for safety and considered going to the 10th Precinct station, but she elected not to do so, having previously been forced to wait outside that station in the cold to file a report after being hit by a car. *Id.* ¶¶ 195, 200, 202–04. Plaintiff Wolff was told to come to the 10th Precinct station to pick up a police report, but she had to send someone in her place because the entrance is not wheelchair accessible. *Id.* ¶¶ 196–99. Their experiences are not atypical of the experience of the other disabled individuals who submitted declarations in support of Plaintiffs' motion.[9]

Defendants have tried to assess and improve access to NYPD's programs and services on three occasions. In 2012, Defendants conducted an assessment of precinct stations' physical accessibility with respect to entrances, bathrooms, and elevators. *Id.* ¶¶ 268–69. In 2017, in connection with this litigation, Defendants hired Urbahn Architects ("Urbahn") to survey 27 stations. *Id.* ¶ 290. This Court excluded Urbahn's report because its conclusions were unreliable. *See* Opinion & Order (Dkt. 126) at 4. In January 2019, NYPD produced a document titled "AccessibleNYPD"—a strategic plan to remediate the concerns that animated this case—indicating that it had retained a vendor to survey all 77 stations. Pls.' 56.1 Stmt. ¶¶ 290, 306; Defs.' Responses ¶ 317. AccessibleNYPD was developed by a working group "comprised of

---

[9] Plaintiff Ryan cannot attend Community Council meetings and other events at her local precinct because the main entrance is not wheelchair accessible. Pls.' 56.1 Stmt. ¶¶ 39, 60–61, 137–39. Plaintiff Ryan tried to use the station's side entrance once—so she could anonymously drop off prescription medications—but to do so she had to maneuver through the station's driveway and around trash bags, "jump" the threshold at the entrance, and, after leaving, contend with vehicles leaving and entering the driveway that left her feeling trapped. *Id.* ¶¶ 148–58. On another occasion, Plaintiff Ryan saw a man standing outside her bedroom window at night and reported the incident to police. Although she wished to keep the incident private from her neighbors, because of the inaccessibility of her precinct station, she had to bring the police to her home to discuss the incident. *Id.* ¶¶ 141–45. A few years later, she faced a year-long delay in replacing an accessible parking tag because she could not get into the station and did not want to bring officers to her home again. *Id.* ¶¶ 161–67. Other Plaintiffs and Declarants—Jones, Ramos, Carr, Massi, Trocchia, Manderson, and Macbeth—have been similarly prevented or deterred from reporting crimes or hazards, seeking safe haven, participating in community events, picking up police reports or family members in custody, following up on complaints, and obtaining permits. *See id.* ¶¶ 222–66.

members of the service from a number of NYPD Bureaus and sub-units." Pls.' 56.1 Stmt. ¶ 297. It sets forth a vision of creating 16 "hub" stations that will be made "fully accessible" to mobility-impaired individuals. In selecting the number of hub stations and the precincts in which to locate them, the working group prioritized density, location, existing accessibility features, cost of remediation, geographic disbursement, and crime levels; but avoided precincts in high-density, high-crime neighborhoods. *Id.* ¶¶ 306, 308–09. Remediation efforts for the hub stations are tentatively scheduled to be completed by December 31, 2021, and will be based on the 2012 assessment, the Urbahn assessment, and possibly a third vendor's assessment. *Id.* ¶ 311–14; Weaver Decl. Ex. 5 at CNY002117.

AccessibleNYPD also includes a written policy issued by the Commanding Officer of the Facilities Management Division ("FMD") in January 2018; a May 2018 Finest Message regarding Accessibility Notices; and Operations Order 35 issued in June 2018. Pls.' 56.1 Stmt. ¶ 317. The FMD policy requires, going forward, an ADA-compliance review of any construction requests that involve structural changes that will have an impact on access to programs and services. *Id.* ¶ 318. The May 2018 NYPD's Finest Message requires "all advertisements, announcements, or invitations for events open to the public hosted by the department [to] contain information regarding accessibility for people with disabilities at the event," and to outline the procedures for requesting an accommodation. *Id.* ¶ 322. Operations Order 35, titled Operational Guidelines for Americans with Disabilities Act (ADA) Compliance, requires that NYPD members determine whether the location at which someone seeks a program or service is "ADA accessible," relying on officers to assess and remove obvious barriers, but not otherwise training them on accessibility. *Id.* ¶¶ 331, 334–35; Weaver Decl. Ex. 12 at 74:2–8, 77:4–25. If the program or service is scheduled at a location that is not accessible, Operations Order 35 instructs

officers to try (1) "relocating and/or rescheduling the event for a different time/location"; (2) "providing phone/video streaming"; (3) "providing services or benefits at an individual's home; or (4) "providing personal assistance." Pls.' 56.1 Stmt. ¶ 336.

## DISCUSSION

I. **Standard of Review**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). Courts must "construe the facts in the light most favorable to the non-moving party and resolve all ambiguities and draw all reasonable inferences against the movant." *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014) (per curiam) (quoting *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 79–80 (2d Cir. 2009)).

"[U]ltimate or conclusory facts and conclusions of law . . . cannot be utilized on a summary judgment motion." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.-Conn.*, 77 F.3d 603, 615 (2d Cir. 1996). As such, a party opposing summary judgment cannot demonstrate the existence of a genuine question of fact by making "assertions that are conclusory or based on speculation." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008) (citations omitted); *see also Hicks v. Baines*, 593 F.3d 159, 167 (2d Cir. 2010).

## II. Plaintiffs' Motion for Summary Judgment on Liability Is Granted

### A. Applicable Law

Title II of the ADA prohibits a public entity from discriminating against "qualified" individuals with disabilities "in the provision or operation of public services, programs, or activities." *Tennessee v. Lane*, 541 U.S. 509, 517 (2004). Similarly, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The "standards adopted by the two statutes are nearly identical." *McElwee v. Cty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012). As for the NYCHRL, the federal statute provides the "floor" for such claims. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 277–78 (2d Cir. 2009). Thus, if Plaintiffs can satisfy their burden under the ADA, they will also have satisfied their burdens under Section 504 and the NYCHRL. *Williams v. City of New York*, 121 F. Supp. 3d 354, 364 (S.D.N.Y. 2015).

To establish liability under the ADA, a plaintiff must demonstrate that (1) he or she is a "qualified individual" with a disability; (2) the defendant is subject to the ADA; and (3) the plaintiff was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by the defendant by reason of the plaintiff's disabilities. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

There is no dispute here that Plaintiffs are "qualified individuals" or that Defendants are subject to the ADA. *See* Pls.' 56.1 Stmt. ¶¶ 1–21. Defendants challenge only the third element—whether Plaintiffs were denied benefits or otherwise discriminated against because of their disabilities. *See* Defs.' Mem. of Law at 1–2.

To prevail, Plaintiffs must therefore show that NYPD has "failed to provide them with meaningful access to the benefit that it offers." *Disabled in Action v. Bd. of Elections in City of New York*, 752 F.3d 189, 199 (2d Cir. 2014) (quoting *Alexander v. Choate*, 469 U.S. 287, 301 (1985)). "Individuals may be deprived of meaningful access to public programs due to architectural barriers or a public entity's failure to modify existing facilities and practices." *Id.* at 197. Congress has recognized that because a "failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion," a public entity must "take reasonable measures to remove architectural and other barriers to accessibility." *Lane*, 541 U.S. at 531; *see also Disabled in Action*, 752 F.3d at 197 (Title II reflects "one of the central aims of the [Rehabilitation] Act" to eliminate architectural barriers (quoting *Choate*, 469 U.S. at 297)). A public entity may not on the basis of disability "afford persons with disabilities services that are not equal to that afforded others." *Disabled in Action*, 752 F.3d at 199 (quoting *Henrietta D.*, 331 F.3d at 274).

Defendants must make reasonable accommodations where "modifications in policies, practices, or procedures . . . are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7); *see also Lane*, 541 U.S. at 532; *Henrietta D.*, 331 F.3d at 281. Title II's implementing regulations provide a "number of ways" to satisfy this requirement. *Lane*, 541 U.S. at 531–32. The Department of Justice's implementing regulations explain that a "public entity may comply with the [relevant] requirements . . . through such means as redesign or acquisition of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, . . . [and] alteration of existing facilities." *Disabled in Action*, 752 F.3d at 197 (quoting 28 C.F.R. § 35.150(b)(1)). "[A] public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance" with its

obligations. *Id.* But if less costly measures are ineffective, a public entity must make reasonable structural changes. *Lane*, 541 U.S. at 531–32.

**B.    Liability**

To determine whether Plaintiffs were discriminated against by reason of their disabilities, the Court must conduct two inquiries. First, the Court must consider whether barriers at precinct stations have prevented individuals with mobility disabilities from accessing the benefits of NYPD's programs and services. If so, the Court must then consider whether NYPD has provided reasonable accommodations. The Parties mainly disagree over the second issue.

**1.    Barriers to Meaningful Access**

Plaintiffs have established that the benefits of NYPD's programs and services are numerous, and public access to many of those programs and services is currently tethered to precinct stations. The undisputed facts show that NYPD's "neighborhood policing" approach puts a premium on local stations. Stations offer space and resources for Community Council and "Build the Block" meetings, fundraising events, parade and sound permit applications, the Clergy Liaison Program, the Cash for Guns Program, and the Prescription Drop Box Program. Some associated benefits are available *only* at stations, such as any meeting or event held at a station, cash payment for a traded-in gun, parade permits requested within ten days of the event, and sound permits.[10] An individual may also try to seek services at a station at any time and place in New York City when an emergency or one-off need arises. Although Defendants argue that stations are *primarily* used for non-public purposes, *see* Defs.' Mem. of Law at 13, the primary use of the station is not determinative: this case is about those uses of the station that are

---

[10]    Defendants suggest that these programs and services can be provided outside stations. Defs.' Mem. of Law at 1, 12. It is almost certainly true that these services *could* be provided outside of stations, but the undisputed facts show that they are currently provided at stations. The actual capability of NYPD to disentangle these services from station houses will be an issue of remedy, not liability.

public. In addition to the programs discussed above, the undisputed facts show that stations are service points for filing complaints, reporting crimes, seeking physical security (including from domestic violence), and replacing an accessible parking permit.

There is also no dispute of material fact that at least a third of stations, and likely more, have pervasive barriers to access. Defendants concede "the uncontroverted fact that . . . certain architectural features of nearly every station building do not comply with the technical standards of the Americans with Disabilities Act Accessibility Guidelines." Defs.' Mem. of Law at 1. That is an understatement. Nine of 22 surveyed stations can be accessed only by stairs, and at least 12 other surveyed stations are accessible only by side and rear entrances with difficult and dangerous paths leading to sometimes inaccessible doors. Precinct stations' architectural barriers have demonstrably prevented Plaintiffs and Declarants from accessing the benefits of NYPD's services and programs—a fact Defendants do not dispute.[11] *See* Defs.' Responses ¶¶ 135–265.

### 2. Reasonable Accommodations

The Court next evaluates whether, notwithstanding the undisputed barriers to access, Defendants have provided reasonable accommodations for persons with mobility disabilities. Defendants contend that NYPD relocates programs to accessible locations, provides alternative means of access, and brings services directly to individuals at their homes or locations outside stations. According to Defendants, NYPD provides meaningful access to the benefits of its programs and services whenever and wherever the need arises. Defs.' Mem. of Law at 12. Defendants argue that NYPD's services and programs "are not rooted to delivery in any

---

[11] Defendants do argue that the Court should strike the declarations of Ramos and Wolff as inadmissible hearsay because they have died. *See id.* at 14. The Court disagrees and accepts the declarations under the residual exception of the hearsay rule; they are as trustworthy as the other declarations submitted with this motion that Defendants do not challenge. *See* Fed. R. Evid. 807. The Court also notes, however, that the result would be the same even if those two declarations were not considered.

particular location" even though they "*may* be provided at the precinct stationhouse." *Id.* at 13 (emphasis in original). In support, Defendants rely almost entirely upon the Declaration of Deputy Chief Thomas Taffe and NYPD's recent adoption of AccessibleNYPD.

Ignoring substance, as an evidentiary matter, the Taffe Declaration has serious problems. Declarations submitted to support or oppose a motion for summary judgment "must be made on personal knowledge, [and] set out facts that would be admissible in evidence . . . ." Fed. R. Civ. P. 56(c)(4). "When an affidavit does not comply with these basic requirements, the offending portions should be disregarded by the court." *Wahad v. F.B.I.*, 179 F.R.D. 429, 435 (S.D.N.Y. 1998) (citing *United States v. Alessi*, 599 F.2d 513, 514–15 (2d Cir. 1979)); *see also Hicks*, 593 F.3d at 167. Deputy Chief Taffe states that his declaration is based on his "personal knowledge as well as on information provided to [him] by members of NYPD, as well as upon NYPD's books and records." Taffe Decl. ¶ 4. Because his declaration is based on a mix of personal knowledge and information and belief, it is difficult to determine which portions of it meet the requirements of Rule 56—a potentially fatal flaw. *See Sellers v. M.C. Floor Crafters, Inc.*, 842 F.2d 639, 643 (2d Cir. 1988). The Taffe Declaration is not, however, so far beyond salvage as Plaintiffs would have this Court believe, *see* Pls.' Reply Mem. of Law at 6; contrary to Plaintiffs' arguments, some of Deputy Chief Taffe's assertions are based on his personal knowledge of specific NYPD documents. The Court therefore considers only those portions of his declaration that are supported by citations to NYPD documents.

As for its substance, the Taffe Declaration contains vague and conclusory statements. Deputy Chief Taffe asserts that "bringing services directly to members of the public at their homes or other locations" provides the benefits of NYPD's services "anywhere within the City, and not exclusively at precinct stationhouses." Taffe Decl. ¶¶ 12–13. Construing the record

generously in Defendants' favor, NYPD is able to deliver some of its services at accessible locations—such as the home, via live phone/video streams, and at accessible public forums—but there is no evidence of the efficacy or reliability of those methods, or the frequency with which they are used. Indeed, many of Deputy Chief Taffe's statements express policy goals, rather than existing reality on the ground. *See, e.g.*, *id.* ¶¶ 14–15, 32. His declaration, in short, contains the barest evidence that Defendants have in any substantial way relocated services from station houses to accommodate persons with mobility disabilities.

The evidence marshalled by Plaintiffs points in the opposite direction. A number of services *require* access to a station to avoid forfeiting a substantial portion of the benefits those services provide. For example, to be able to use the Anonymous Prescription Drop Box Program outside a station, an individual must give up anonymity—an important aspect of the program for at least some participants—in order to obtain an accommodation. *See* Pls.' 56.1 Stmt. ¶ 134. And stations, as already noted, are important providers of emergency and crime-prevention services. Although NYPD may provide those services in the home, individuals with mobility disabilities are still forced to forego the option that others have of going to the precinct station. The undisputed facts show that such an option provides benefits in the context of public safety. Moreover, individuals who must invite officers into their homes are forced to give up the right to the privacy of their home that their able-bodied peers are not.[12] And some crimes, such as domestic violence or theft by a roommate, occur in the home, making it, sometimes, a less-than-ideal location in which to discuss those crimes with the police.

---

[12] This is not insignificant. While many times it will not matter, and a person wishing to interact with the police will be more than happy to invite them into the person's home, it takes no wild imagination to posit circumstances where that is not true. For example, a person may be reluctant to invite a police officer into his or her home if other residents are undocumented immigrants, drug dealers or users, or come from a community with a historically fraught relationship with law enforcement. Similarly, a person who lives in a neighborhood where the watchword is "snitches get stitches" may be particularly reluctant to invite the police into his or her home.

Defendants do not actually challenge Plaintiffs' assertion that barriers prevent access to precinct stations across the city, *see* Defs.' 56.1 Stmt. ¶ 343, but instead contend with Plaintiffs' evidence by arguing that NYPD is not required by law to provide all of its programs and services at accessible stations, *see* Defs.' Mem. of Law at 12. That issue is largely irrelevant. Although stations need not be *the* single point of service (and this opinion should not be read to hold that all barriers to access at all stations must be removed regardless of cost in order to remediate their violation), Defendants must demonstrate that there is a question of fact whether they offer reasonable accommodations in order to provide what the law does require—meaningful access to programs and services that are provided at stations. The undisputed facts show that stations currently serve as *an* integral point of service, and yet many have architectural barriers that prevent mobility-impaired individuals from utilizing them.

Defendants further argue that Plaintiffs' expert report does not consider how NYPD delivers its programs. *See id.* at 13. But that argument is also largely irrelevant, as this Court has already affirmed the reliability of Plaintiffs' expert report and limited Plaintiffs' expert to measuring and identifying instances of non-compliance with federal regulations—the "bulk" of her report. Opinion & Order at 15. Her report concluded that at least a third of the stations she surveyed have extensive accessibility barriers—as assessed against the ADA's Accessibility Guidelines. Plaintiffs have now shown that those barriers are not merely theoretical or technical—they have actually prevented individuals with mobility disabilities from accessing the benefits of services provided from stations.

Finally, Defendants rely heavily upon AccessibleNYPD's "strategic plan" "to ensure that the public can access its programs." Defs.' 56.1 Stmt. ¶ 342; Defs.' Responses ¶ 317; Taffe Decl. ¶ 5. Although that plan is a start, it is not evidence that creates a dispute of material fact

regarding current accessibility of the programs and services at stations; it is a statement of aspiration. In contrast, Plaintiffs have presented ample evidence that persons with mobility disabilities cannot meaningfully access a host of NYPD services and programs that are currently provided in inaccessible stations. That is enough to establish liability. *See United Spinal Ass'n v. Bd. of Elections in City of New York*, 882 F. Supp. 2d 615, 627 (S.D.N.Y. 2012), *aff'd* sub nom. *Disabled in Action*, 752 F.3d at 194 (holding the Board of Elections of the City of New York liable because poll sites had "pervasive and recurring barriers to accessibility" and the defendants "failed to accommodate reasonably voters with disabilities"). Moreover, although Defendants' "hub" plan may be a rational part of a sensible solution to providing access to NYPD services to persons who are mobility impaired, the Court has serious reservations about the efficacy of a plan to turn just 16 of the 77 stations (less than 25% of all stations) into "hubs" of accessibility as the primary solution.

This plan disregards the undisputed benefits of delivering NYPD services and programs at a local level—for an individual is most likely to seek services at his or her local station. Defendants try to downplay how NYPD tailors its programs and services to the different communities it serves. *See* Defs.' Mem. of Law at 13. But Deputy Chief Taffe's own account of neighborhood policing emphasizes how it "allow[s] the Department to focus on the individualized needs of each community." Taffe Decl. ¶¶ 10–13. Defendants' position is also contradicted by the record. AccessibleNYPD's "hub" plan would require mobility-impaired individuals, on average, to travel significantly farther than individuals who are able-bodied to reach a precinct station at which they can access police services. Such a plan—at least if it is the sole solution to the lack of accessibility—may well significantly burden the ability of mobility-impaired persons to participate in community engagement activities, and to benefit from

17

neighborhood policing, location-specific services, or ready access to public safety. Notably, NYPD deprioritized putting "hub" stations in populous areas with high crime rates in order to avoid overburdening those precincts. Pls.' 56.1 Stmt. ¶ 309. That might be a reasonable balance of priorities, but one could also argue that mobility-impaired individuals are particularly vulnerable to crime and, therefore, making stations accessible in such areas should be a priority.

This may ultimately be a policy choice; in any event, it is not critical to the issue of liability. It is, however, a harbinger of the very difficult tradeoffs that will have to be made as part of the remedy in this case. The Court need not delve into the minutia of AccessibleNYPD's plans at this point. The degree to which each station must be made accessible is a question of remedy, and will depend on the mix of accommodations that NYPD can and will provide. Plaintiffs have shown that they are entitled to relief, and Defendants have failed to raise any dispute of material fact on that point. That ends the Court's inquiry on this motion.

When the Court considers remedy, Plaintiffs will have "to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Henrietta D.*, 331 F.3d at 280. NYPD must then show "that the accommodations [Plaintiffs] propose would be unreasonable to implement" because they either "fundamentally alter the nature of [its programs and services]" or "impose an undue financial or administrative burden." *Disabled in Action*, 752 F.3d at 202 (quoting *Lane*, 541 U.S. at 532). The injunction the Court crafts (assuming the Parties cannot work out a solution between themselves) will order NYPD to

comply with its statutory obligations and impose procedural mechanisms to effectuate that goal. *See id.* at 202 (quoting *Henrietta D.*, 331 F.3d at 280).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for partial summary judgment on liability is GRANTED. The Parties must meet-and-confer in good faith and submit a joint letter no later than **March 12, 2020**, describing their efforts to reach a solution on remedy and proposing next steps for this litigation. The Court will hold a status conference on **March 20, 2020, at 10:00 a.m.** The Clerk of Court is respectfully directed to close open docket entries 127 and 128.

**Date: February 4, 2020**
**New York, New York**

**VALERIE CAPRONI**
**United States District Judge**